MOBILE, JACKSON & KANSAS CITY RAILROAD COMPANY v. VIC-
TORIA C. JACKSON.

[46 South., 142.]

1. JURIES.   *Credibility of witnesses.   Weight of evidence.   Limit of*
   *power.*

   Juries are the judges of the credibility of witnesses and of the
   weight of the evidence, but cannot arbitrarily and capriciously
   disregard unimpeached testimony supported by all the circum-
   stances in the case.

2. INSTRUCTIONS.   *Evidence.*

   Instructions not predicated of the evidence, or submitting as doubt-
   ful a matter on which there is no conflict in the evidence, should
   not be given.

3. RAILROADS.   *Drunken passengers.   Action for death.   Conductor's*
   *duty.*

   In an action against a railroad company for the death of a drunken
   passenger, who was drowned after alighting from the train:

   (a) It was error to instruct the jury not to consider his drunken-
   ness but to view his conduct in the same light as they would that
   of a sober man in like circumstances; because

   (b) If a conductor knows that an alighting passenger is so drunk
   as to be unable to take care of himself, he should deal with him
   according to his then condition, considering what would reason-
   ably happen to him if left alone where he alights from the train.

FROM the circuit court of Union county.

HON. JAMES B. BOOTHE, Judge.

Mrs. Jackson, appellee, was plaintiff in the court below; the
railroad company, appellant, was defendant there.   From a
judgment in plaintiff's favor for $5,000 defendant appealed to
the supreme court.   The facts are stated in the opinion of the
court.

*Fontaine & Fontaine,* for appellant.

The fact that the deceased was intoxicated did not alone de-
prive him of the right to be upon appellant's train, and the de-

gree of care due a drunken passenger is the same as that due a sober one.  *Milliman* v. *New York, etc., R. R. Co.,* 66 N. Y., 642; *Stewart* v. *Chicago Ry. Co.,* 67 Mich., 380.

Ordinary care and due diligence for the safety of an intoxicated passenger on railroad track are all that is required of the company.  *Louisville Ry. Co.* v. *Sullivan,* 81 Ky., 624, 50 Am. Rep., 186.

` And the law exacts from one intoxicated the same care and precaution to avoid injury as it would from a sober person of ordinary prudence under like circumstances.  *Columbus & W. Ry. Co.* v. *Wood,* 5 South., 463, and authorities cited; *Johnson* v. *Louisville, etc., Ry. Co.,* 16 South., 75.

And when intoxication is shown the burden of proof is on the plaintiff to show that he was in the exercise of ordinary care and prudence to entitle him to recover for an injury. *Burns* v. *Elber,* 32 Wis., 605; *Cramer* v. *Burlington,* 42 Iowa, 315; *Hubbard* v. *Mason City,* 60 Iowa, 400.

And the doctrine that voluntary incapacity is no excuse is plainly deducible from *Railroad Co.* v. *Vallely,* 32 Ohio St. 345; *Thorp* v. *Brookfield,* 30 Conn., 320; *Toledo Ry. Co.,* v. *Riley,* 47 Ill., 514.

The undisputed evidence in the case shows that the deceased Jackson and his companion Purvis had been drinking before they got on defendant's train at New Albany, and drank after they got on the train; did not leave the train at Ecru, the station on appellant's road, to which they had purchased tickets, but paid their fare to Ball's Crossing (a flag station on defendant's road and no regular stopping place) and demanded and insisted that train stop and they be let off there for the purpose of attending a party or dance.  That deceased Jackson was boisterous using profane and indecent language, until the conductor threatened to put him off of train.  The conductor would have been justified in ejecting him from the train at a proper place and under suitable conditions, having reasonable regard for the safety of his life and limb.  The conductor having this right (but there was no ejectment, Ball's Crossing was their

destination) and there was no negligence, or breach of duty in allowing him to get off the train, especially with his companion, Purvis, at point of destination, or to assist him in departing on his demand to get off.  *Nash* v. *Southern Ry. Co.,* 33 South., 932.

The injury did not happen to Jackson on the train but after he got off at his destination with his companion, Purvis. His leaving the train was not the natural or proximate cause of his death, but was due to his voluntary intoxication.  *Meyer* v. *Kind,* 72 Miss., 1.

*May, Flowers & Whitfield,* on the same side.
The record shows:—

I. That the deceased did have a companion with him and the employes of the railroad and passengers had every reason to believe the two men were together.

II. That the deceased was not in a stupor but on the other hand was very much alive, being loud and boisterous, cursing and carousing around the car.

III. That he did buy a ticket to Ecru and paid his fare to Ball's Crossing and that he had made it known to every one that he was going to get off at Ball's Crossing.

IV. That he got off at his own request and demand and that of his companion, and he was assisted off and not ejected.

V. That the deceased met his death after he had severed all connection with the railroad company and it was through his own negligence, wilfulness and misconduct that he did so, and the railroad company cannot be held responsible.

*C. Lee Crum,* for appellee.
The jury found as a matter of fact in this case:—

1. That deceased, W. H. Jackson, was a passenger from New Albany to Ecru on appellant's road and had a ticket for his transportation.

2. That the conductor did not collect deceased's fare from Ecru to Ball's Crossing.

3. That deceased did not request to be put off at Ball's Crossing.

4. That the conductor and trainmen forcibly ejected him at Ball's Crossing.

5. That the deceased was drunk, but that his drunkenness did not contribute to his injury.

6. The ejecting the deceased at the time, place and under the circumstances was negligence on the part of the railroad company and was the proximate cause of the injury.

7. That plaintiffs are thereby damaged $5,000.

All these facts are sufficiently supported by the evidence.

The appellant company accepted the deceased as a passenger at New Albany for Ecru when he was really and apparently too drunk to care for himself. In this condition the appellant, as a common carrier of passengers, had the right to reject deceased, but when it accepted him, knowing his condition, it obligated itself to use special care and caution to prevent injury to deceased and to put him off at Ecru the place of his destination, in a place of safety for one in his condition, if he was not able to disembark. This the defendant failed to do. This proposition of law is supported by the authorities: 3 Thompson on Negligence, (2nd ed.) sec. 2740, *Ib.*, 3246; *Meyer* v. *St. Louis R. R. Co.*, 58 Am. & Eng. R. R. Cases, 111; 54 Fed. Rep., 116; 10 U. S. App., 677; *Croom* v. *Chicago, R. R. Co.*, 52 Minn., 296; *Weightman* v. *Railway Co.*, 70 Miss., 563; 12 South., 586; *Zachery* v. *Mobile, etc., R. R. Co.*, 75 Miss., 746, 23 South., 434; *Railroad Co.* v. *Stratham*, 42 Miss., 607; *Holmes* v. *Oregon R. R.*, 6 Sawy. (U. S.), 262; *Illinois, etc., R. R. Co.* v. *Smith*, 37 South., 643.

WHITFIELD, C. J., delivered the opinion of the court.

Learned counsel for the appellee says frankly in his brief that "the case at bar is for injuries resulting from the action of the conductor and crew in putting off deceased after he had passed Ecru, his destination, at a time and place and under

conditions that would not only reasonably lead to his death, but must necessarily have resulted in drowning or freezing him to death"; and the declaration itself plainly shows that the suit is for damages for the alleged willful and wanton wrong of the appellant company in ejecting the deceased from the cars of appellant when the deceased was drunk to insensibility and utterly incapable of sitting, walking, or standing, the appellant well knowing these facts, and at a time and place—that is to say, in the nighttime and at a flag station, with the ground covered with ice, sleet, and snow—when to so put him off in such condition meant death.

Now, what is the case made by the testimony? Practically this: The deceased, Jackson, a section hand fifty-eight years old, strong and robust, and one Purvis, twenty-one years old, got to drinking Peruna in the town of New Albany on the 2d of February, 1905, the day of the night on which Jackson was drowned, and drank along through the day a good deal of Peruna. They boarded the cars, having purchased tickets from New Albany to Ecru. After they got on the car they drank about a bottle and a half more of Peruna, making about four bottles or more of Peruna that the two consumed during the day and this part of the night. The conductor took up Purvis' ticket. He did not take up Jackson's ticket; but Jackson told him he had, and the conductor yielded the point. It is clearly shown that Jackson's ticket was found in his pocket after his death. It is further clearly shown, by the uncontradicted testimony of the conductor, that after the train had passed Ecru the conductor asked these two men where they were going, and they told him they were going to Ball's Crossing, whereupon he collected the cash fare from each, from Ecru to Ball's Crossing. Learned counsel for appellee says, in the passage just above quoted, that the suit was for putting off the deceased after he had passed Ecru, his destination. There is not a particle of testimony to contradict the statement of the conductor that he took the cash fare from Ecru

to Ball's Crossing; and it is shown, also, without contradiction, by two or three witnesses, that both Purvis and Jackson said they were going to Ball's Crossing—one witness saying to a party, another witness saying to a dance, and by another witness that he invited Jackson to go home with him that night, and he declined to do so, saying that he was going to Ball's Crossing, and by the conductor and another witness, all uncontradicted, that the conductor offered to take Jackson to Pontotoc free, if he would go on, which Jackson declined, insisting on getting off at Ball's Crossing. Learned counsel for appellee insists, too, in the statement quoted, that the suit is for the ejection, or putting off, of the deceased. The whole testimony, uncontradictedly, shows that Purvis and Jackson were not put off or ejected, but that the one got off, Purvis, and the other, Jackson, was assisted off, on their own demand and upon their own insistence.

The strongest feature of appellee's case is the insistence that Jackson was drunk to the point of insensibility when he got on the cars—so drunk that he could not sit, stand, or walk, or in any manner take care of himself, and that this condition was thoroughly known to the conductor, and that hence the conductor, in allowing him to get off even, or be assisted off in that condition at the place, a public crossing and flag station, with the ground covered with sleet and snow and ice, and the temperature freezing, was guilty of willful and wanton wrong, for which the company should answer in damages. But on the point how drunk Jackson was when he got on the cars at New Albany, and how drunk he was after the continued drinking on the cars between New Albany and Ball's Crossing, the testimony is in utter conflict; the clear preponderance of the testimony, however, being that, whilst perhaps drunk when he boarded the cars, he was not then in any insensible condition, and that whilst, of course, much drunker when the train reached Ball's Crossing, he yet could walk, though staggering— had walked down the aisle and taken his seat on the opposite side from the one he had been sitting on—had walked down and

demanded to know if a certain point was Ball's Crossing, and was cursing and boisterous throughout the ride. It is true that on the testimony of the witness Will Buchanan alone the jury might well have found that he was, at the time the train reached Ball's Crossing, too drunk to walk or stand, and that this condition was known to the conductor; but the testimony of the other witnesses is positive, and directly to the contrary of the statement of Buchanan about this, and the clear preponderance of the evidence, on this record, would go no further than to show that Jackson was drunk when they reached Ball's Crossing, but that he could walk, though having to be assisted down the aisle and down the steps to keep him from falling, and that he knew what he was doing, since he peremptorily declined the conductor's offer to take him to Pontotoc, and insisted, repeatedly, that he would get off at Ball's Crossing, and did get off, in pursuance of his own demand, together with Purvis. Another curious fact testified to by Will Buchanan is that he was put off on the right side—that is, the west side—going towards Pontotoc, of the railroad track, and yet was found drowned the next day on the east side. Now, the railroad track is shown to have been from eight to ten feet high. Will Buchanan further testified that the deceased rolled down the dump on the right side of the track. It seems perfectly conclusive, from this statement of Buchanan's, that Jackson could walk and did walk, in some way, from the west side of the track, over the railroad, to the east side of the track, where he was found drowned the next day.

Now, from this rough outline, which we will fill in more in detail further on in this opinion, some things are perfectly clear: First, that there is not one particle of testimony in this record anywhere to show that Jackson was put off or ejected. He was simply permitted to get off, and assisted off at the place, Ball's Crossing, at which he insisted on debarking, together with Purvis, and yet the plaintiff's case proceeds upon the theory that Jackson was wantonly and willfully ejected. It is perfectly

plain that he did pay his fare from Ecru to Ball's Crossing. Learned counsel for appellee insists that the jury found that this was not true; but the jury had no right, arbitrarily, to make any such finding on the testimony in this record. There is no contradiction of the conductor's statement; nor is there any contradiction of the testimony of the witnesses, who state that they both insisted on going to Ball's Crossing and getting off there. Juries cannot arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case. And from this it results, of course, in the third place, that Ecru was not Jackson's destination, and that he was not carried past his destination, when he was carried to Ball's Crossing. Here, then, are three things set out in the statement quoted from the plaintiff's second brief, as constituting the grounds of the action, not one of which is supported by the testimony. And when we come, in the fourth place, to the only proposition on which the plaintiff could possibly recover, to-wit, the one above stated, that the conductor, knowing that Jackson was drunk to the point of insensibility, and utterly unable to take care of himself in any way, put him off willfully and wantonly in that condition at a time and place and under circumstances which must have resulted necessarily in his death, we find one of the witnesses for the plaintiff, Buchanan, opposed to the rest of the witnesses testifying on the point, supported, it is true, by Purvis as to the statement that Jackson could not walk at Ball's Crossing. We do not say that the jury, as to this last point, on all the facts set out in this record, may not have been warranted in believing Buchanan. We leave that open, for there are circumstances testified to here and there in the record tending to support his testimony, as for example, there is testimony that when Jackson himself got up and took one step, Purvis asked the conductor to have him assisted off, and three brakemen, one on each side and one behind, took hold of him and assisted him down the aisle and down the sleet-cov-

ered steps of the car to the ground. This would indicate that
he was so drunk that he could not walk without staggering—
could not get off without assistance; but it does not necessarily
follow from this that he was drunk to insensibility, or so drunk
that he could not say what he wanted to do, and direct the con-
ductor as to where he wished to get off. There is other testi-
mony that he was "drunk, but could navigate," and that he
could walk, at Ball's Crossing, and even that he "could have
gotten off by himself, unassisted, if he had been given time
enough." It is true, on the other hand, that the conductor him-
self admits that he heard one of the brakemen say, just as the
train had started and had gotten not more than fifty yards from
Ball's Crossing, that the last he saw of Jackson he was rolling
down the dump. Suffice it to say that the testimony on this
vital point may, on this record, be said, so far as the clear pre-
ponderance is concerned, to be against the case as made out by
Buchanan's testimony, and to tend strongly to establish the
proposition that Jackson, while drunk when he got on the train,
and much drunker at Ball's Crossing, nevertheless was not
drunk to the point of insensibility, but was mentally, at least,
capable of saying what he wished to do, where he wished to get
off, and insisted upon having his way about that, and that he
did get off in pursuance of his own demand, and was in no sense
of the word ejected or put off.

Another curious feature about the testimony will be noted,
and that is this: That whilst the court instructed the jury that
no punitive damages could be allowed in this case, and hence
the case was left to stand alone upon such actual damages as
the proof showed, there is not one particle of evidence in the
case to show what the earning capacity of Jackson was—how
much money he was making per month or per year; in short,
not a syllable of testimony as to what he was earning for the
support of his wife and children—what he was worth as a bread-
winner. How a jury could render a verdict for $5,000 damages
on the record thus made by this case on these instructions passes

all comprehension.  It must be referable solely to passion and prejudice, or misleading intentions; for it can find no support in any legal view possible to be taken of the case as made by the record.  We have gone through this record on the facts repeatedly, and given the case a most critical and thorough examination, and we have stated it thus fully for the purpose of demonstrating the utter lack of support to be found for the verdict of the jury, either in the law or the testimony in the case.

We add another observation or two as to the testimony.  Jim Lyons, who was not in the service of the railroad company, testified uncontradictedly that he asked Jackson to go home with him, and Jackson said, "No," he wanted to go to Ball's Crossing; and, further, that he heard the conductor, Newberry, say to Jackson, "Mr. Jackson, if you will go on to Pontotoc, and not get off" (that is, at Ball's Crossing), "I will take you free," and Jackson said, "No, sir," he wanted to stop at Ball's Crossing.  There is no contradiction of any sort of this testimony of this disinterested witness.  A very earnest effort was made by the learned counsel for the appellee to elicit from this witness a statement that the conductor said he did not wish to put Jackson off, on account of its being so cold and Jackson being helpless, and the witness did so answer once; but in the further progress of his examination he says repeatedly that he could not say that was the reason, finally saying, "Well, I never heard him [the conductor] say no reason;" and this witness further states that he was "sure Jackson could walk around when he got to Ball's Crossing, and that Jackson was standing up on the ground when he, the witness, stepped back into the coach."  The witness Will Harvey makes a very positive statement that Jackson, when the train ran into an open switch at Cherry Creek, walked down the aisle and asked if this was Ball's Crossing, and that, when the train stopped at Ball's Crossing, Jackson got up and started out, and was staggering in the aisle, when the conductor had him assisted off, and that, the last he saw of him, he turned and started and was standing

up, and Purvis standing by him and holding him. It must be said, however, that this witness was still in the employ of the company, and that he was flatly contradicted on a material point by Will Mercer, another witness, himself, however, the son-in-law of Jackson. Newberry, the conductor, testified through-out with great apparent frankness; some of his testimony being damaging to the railroad company. He says that he had him assisted off because the steps had ice and sleet on them, and he says, what several other witnesses testify to uncontradictedly, that Both Purvis and Jackson were put off in pursuance of their insistent demand to be put off at Ball's Crossing, and that, whilst "both were drinking, neither was so drunk that he was not able to walk around through the train." H. B. Adams, a clerk in Memphis, Tenn., testifies, without contradiction, that the destination of Jackson was Ball's Crossing, and that they both said they wanted to get off at Ball's Crossing, and that they were going to a party there, and that Jackson got up out of his seat, and was assisted, after getting up, by the porters, and that Purvis himself asked the conductor to help him get Jackson off the train, and, further, most significantly, that "Jackson might have gotten off by himself, if he had been given time," and that he saw Jackson get up and walk down the aisle before they got to Ball's Crossing, and take a seat on the opposite side from the side on which he had been sitting. This witness is in no manner impeached, and appears to be perfectly disinterested. W. R. Brown, a traveling sales-man from Memphis, testified that Purvis and Jackson took the train for Ball's Crossing, and that he saw them take two or more drinks between New Albany and Ball's Crossing, and that Jackson was very disorderly, drinking and using profane language throughout the trip; that Purvis asked Jackson if he (Jackson) was not going to get off at Ball's Crossing, and Jackson said, "Yes"; that they were not ejected or put off, but got off the train of their own accord, and upon their own demand, and that they were going, as they said, to a dance; that both

were drunk, Jackson more than Purvis, but that both were able
to navigate, and that Purvis asked Newberry to assist Jackson
off the train; and, finally, that the witness saw that Jackson
was on the ground safely; that he and Purvis were standing
on the track—that is, were safely on the ground.

The last thing we desire to say about the testimony is that it
is shown distinctly by the testimony of Jackson's son-in-law,
Will Mercer, that he himself was a section foreman, and that
Jackson was a section hand under him; that Ball's Crossing
was in his section, and that Jackson was thoroughly familiar
with the location and all the surroundings at Ball's Crossing.
This, then, is the case made by the facts, upon which we desire
to make a single observation: That, manifestly, the clear pre-
ponderance of the testimony is with the appellant company on.
this record, and that, unless, on a new trial, the plaintiff shall
be able to materially strengthen the case, there should be a per-
emptory instruction to find for the defendant, since no verdict
should be allowed to stand on this testimony for damages.

But this is not the whole case.  When we come to consider
the instructions of the court, the confusion only deepens.  The
plaintiff asked sixteen instructions, the first twelve of which un-
brokenly were refused.  Without burdening this opinion by hav-
ing all these instructions, refused and given, set out, it is suffi-
cient to observe as to the refused instructions as follows: That
running through nearly all of the refused instructions is the
proposition that the defendant's conductor put Jackson off—
ejected him.   All these instructions were properly refused, since
there is not a particle of testimony showing that there was any
ejection of Jackson.   Coming to the instructions given for the
plaintiff, two of these, Nos. 15 and 16, are simply as to the right
of the jury to judge of the weight of the evidence, etc., and were
properly given.   The thirteenth instruction for the plaintiff
ought not to have been given, because it submits to the jury, as
a doubtful question, the question whether the conductor col-
lected Jackson's fare from New Albany to Ecru, when it is plain

from the testimony, and so argued by the appellee, that Jackson's ticket was found in his pocket after he was drowned; and secondly, because it also submits to the jury as a fact, doubtful on the testimony, whether the conductor put Jackson off because he had been carried beyond his destination, when the uncontradicted testimony is that Jackson had paid the conductor the cash fare from Ecru to Ball's Crossing, Purvis himself saying that he did not know whether he (Purvis) had paid the cash fare for Jackson, but he had paid his own cash fare. The fourteenth instruction for the plaintiff is also erroneous, because it leaves it to the jury to say whether Jackson had been carried past Ecru, his destination, for the same reasons above set out. Of the whole instruction asked for the plaintiff, sixteen in number, therefore, only two were properly given, and they related only to the right of the jury to determine the weight of the testimony and the credibility of the witnesses.

How was it, now, as to the instructions given for the defendant? The court actually gave the defendant nineteen instructions and refused two, one of the two being a peremptory instruction; and this in a case where a half dozen instructions, at the most, should fully have covered the determining points in the case. Indeed, a half dozen instructions on either side, would fully and clearly have put the pivotal points in the case. The cloud of instructions could only have had the effect of obscuring the issues that should have been brought out in bold relief by a few crisp, clear charges. We will say, very briefly, in respect to the instructions for the appellant, at this time, just this: That instruction No. 8 was erroneous, since no question should have been submitted to the jury about Jackson's being carried past his destination; and that instruction No. 9, and several others presenting the same principle, is too extreme in its statement of the law as to drunkenness. It is not a correct proposition to say, as instruction No. 9 does, that the jury are not to consider at all the drunkenness of the said Jackson, but that they are to view his acts and doings in the same way and in the

same light as they would those of a sober man under similar circumstances. How drunk Jackson was at the time he reached Ball's Crossing is a question of fact to be found by the jury; and if the conductor of the train knew that Jackson was drunk to the point of utter insensibility, so that he could neither sit, nor stand, nor walk, and so that, in a word, he was in no way capable of taking care of himself, then the conductor should-have dealt with him according to the condition he was then in, and in view of what would reasonably happen to him in such a condition, if left at Ball's Crossing, with the surroundings then and there obtaining. All the charges given for the defendant should have been modified in accordance with the announcement just made. Finally, we observe that instruction No. 17 for the appellant distinctly told the jury that no punitive or exemplary damages could be awarded in the case, and yet instruction No. 18 tells the jury, just as distinctly, that "if you may believe from the evidence in this case that W. H. Jackson was ejected from defendant's train for the nonpayment of fare, the defendant had the right to do this, and unless you believe said ejectment was willfully, wantonly, and wrongfully made, you will find your verdict for defendant." In other words, the court told the jury in instruction No. 17 that they could not award any punitive damages, and yet, immediately thereafter, in instruction No. 18, tells them that they must find an absolute verdict for the defendant against all damages unless they believe that there was an ejection willfully and wantonly made. If the jury had obeyed these two instructions, as it was their duty to do, then, manifestly, under instruction No. 17 they could have awarded no punitive damages, and under instruction No. 18 they could have awarded no actual damages. These two instructions, taken together, practically amounted to a peremptory instruction to find for the defendant; and yet the court overruled the motion for a new trial, the jury having awarded $5,000 damages.

It certainly must be perfectly obvious, now, on this full statement of this record, both as to the facts and the law, that this verdict, on the case as now made, cannot stand.   There is no explanation of it, except on two theories—one that the jury were misled, as they may very probably have been, by the errors in the instructions pointed out; and the other, that the verdict was attributable to prejudice and passion, the result being arbitrarily reached in the face of the law and the evidence.   Public service corporations must be held to the very strictest accountability under the law.   There must be no relaxation of those principles which give the public the right to demand the best service and the strictest discharge of their duties as public service corporations.   On the other hand, no more will it do to tolerate verdicts against them which are manifestly the result of arbitrary action in the face of the testimony and the law of the case, whether such result be attributable to erroneous instructions or to prejudice and passion on the part of the jury. The public must be protected in its rights fully, but the public service corporations must also be just as fully protected by the courts of the country in their just rights.

*Reversed and remanded.*