## HADDOX, APPELLANT, *v.* NORTHERN PACIFIC RAILWAY CO. ET AL., RESPONDENTS.

### (No. 2,931.)

(Submitted January 31, 1911.   Decided February 23, 1911.)

[113 Pac. 1119.]

*Railroads—Personal Injuries—Trespassers—Willful Negligence —Evidence—Insufficiency.*

Negligence—"Willfully."
1. The rule prescribed by Revised Codes, section 8099, declaring that the word "willfully," when applied to the intent with which an act is done or omitted, implies simply a willingness to commit the act or make the omission referred to, and does not require any intent to violate law or to injure another, or to acquire any advantage, applies also in civil cases.

Evidence—Weight—Credibility of Witness—Disregarding Testimony.
2. Under Revised Codes, section 8028, paragraph 1, providing that the jury are to be instructed that their power of judging the effect of evidence must be exercised in subordination to the rules of evidence, juries may not arbitrarily disregard testimony of unimpeached witnesses supported by all the circumstances in the case.

Railroads—Injuries to Person on Track—Willful Act or Omission—Insufficiency of Evidence.
3. Evidence *held* insufficient to show that the death of one struck by an engine while on the track was due to any willful act or omission on the part of defendant railroad's engineer.

*Appeal from District Court, Jefferson County; Llew. L. Callaway, Judge.*

ACTION by Thomas Haddox against the Northern Pacific Railway Company, a corporation, and another.   Judgment for defendants, and plaintiff appeals.   Affirmed.

In behalf of Appellant, *Messrs. Maury & Templeman, Mr. M. H. Parker,* and *Mr. J. O. Davies,* submitted a brief.   Oral argument by *Mr. H. L. Maury.*

The acts of the defendant engineer have been tersely defined and the law relative thereto has been clearly set forth in one sentence.   After speaking of the presumption that an engineer may indulge—that a person will leave the track at the sound of the whistle, and admitting its general force and effect—the

supreme court of Missouri added as its reason for affirming a judgment against the defendant, where the facts were similar to the one at bar: "Men cannot kill on presumptions when they know the grounds for the presumptions have ceased." (See *Bouwmeester* v. *Grand Rapids etc. Co.*, 63 Mich. 557, 30 N. W. 337.) If there be an intentional doing of the act which does the injury, and if the party doing the act is conscious that injury is likely to result from the doing of the act, then the failure to cease doing the act, and the failure to attempt by all possible means to prevent the injury constitutes a willful and a wanton act, for which the law allows no defense in the way of contributory negligence or assumption of the risk. (29 Cyc. 509.) Recoveries have often been allowed and the act criticised as willful or wanton, in the case of adults being run over by trains under exactly similar circumstances as the one at bar. (See case cited above; also *Kelly* v. *Ohio River Co.*, 58 W. Va. 216, 52 S. E. 520, 2 L. R. A., n. s., 898; 3 Elliott on Railways, sec. 1257*a*; White on Personal Injuries, sec. 1078; *Palmer* v. *Chicago etc. R. Co.*, 112 Ind. 250, 14 N. E. 75.)

*Mr. Wm. Wallace, Jr., Mr. John G. Brown,* and *Messrs. Kelly & Kelly,* submitted a brief in behalf of Respondents. *Mr. Brown* argued the cause orally.

When defendant engineer realized the boy's peril, he used all the means within his power to stop the train, but failed. No one could have stopped the train or done more. Such actions cannot be characterized as "willful and intentional disregard of a boy's life." The case comes squarely within that cited by the lower court (*Pittsburg etc. Railway* v. *Judd,* 10 Ind. App. 213, 36 N. E. 775), and also the case of *Alabama Co.* v. *Hall,* 105 Ala. 599, 17 South. 176, and the court's ruling was correct. In further support of it we submit the following: White on Personal Injuries on Railways, 1075 *et seq.;* Thompson on Negligence, sec. 1705 *et seq.; Friend* v. *Railway,* 104 Wis. 663, 80 N. W. 934; *Dull* v. *Railway,* 21 Ind. App. 571, 52 N. E. 1013; *Williams* v. *Railway,* 146 Ala. 680, 40 South. 143; *McLaughlin* v. *Railway,* 115 Ill. App. 262; *Smalley* v. *Railway,* 57 S. C. 243, 35 S. E. 489.

MR. JUSTICE SMITH delivered the opinion of the court.

On January 20, 1909, Omer Haddox, about fourteen years of age, a son of the plaintiff, was struck by an engine of the defendant company, in its yards at Whitehall, and killed. The engine was in charge of engineer Thomas Barry. The complaint alleges that Barry willfully and intentionally drove the engine against the boy at a rate of speed in excess of thirty miles per hour. The closing allegation is that the acts of the defendants were "willful, intentional, and in criminal disregard of the life and safety of the boy." No negligence is charged. Compensatory and punitive damages are demanded. Both parties introduced evidence. After the testimony was closed, the district court of Jefferson county directed a verdict for the defendants. Plaintiff appeals from the judgment entered on the verdict.

Wm. B. Huddleston testified for the plaintiff: "Before the engine struck the boy there was no unusual sound from the engine more than his whistle; the whistle was a danger signal—the stock whistle. The whistle must have sounded fully 200 yards before he struck the boy. Before the boy was struck he was walking toward the depot, west, with his head down, and just before the train struck him he looked up and across toward an engine that was on the sidetrack. He had a dog with him. Between the time that I heard this stock or emergency whistle and the time the boy was struck, he had not turned around toward the engine that was approaching him. I could not see any efforts that Mr. Barry made to stop that train before the boy was struck; I could not see inside the cab. I could not say that there was much checking of the speed; I could not see that he was making much effort to check the train—that is, at the time it struck the boy. The train stopped at the usual place by the depot where it formerly stopped. The boy was carried or thrown by the train in the neighborhood of thirty feet—some that measured it said it was thirty-seven feet; he was eight feet of [off] the track. When I first noticed the boy on the track he was, I should judge, 400 yards below the depot, east of the depot. I could not say how long he was on the track; he walked up, I

should judge, within 200 yards until the train struck him. When I first heard the stock whistle, I would judge the train was running thirty-five miles an hour or better. When it struck the boy, it probably had slowed a little; I could not tell exactly. Before the engineer got to the boy he could have seen him half a mile at least. If there had been any attempt to check the train before it struck the boy, I would not have noticed it particularly. I would have been able to see if any checking of speed had occurred. I did not see any checking of the speed of the train. The boy was struck under the left shoulder. I am certain that he was walking on the ends of the ties, because he was close to the rail. I made the statement at the coroner's inquest that I made the remark that the boy would get killed just as Barry jerked his whistle for the usual whistle when anything is on the track. He whistled along and ran up sixty or seventy feet, when he began to whistle short whistles up to the time the boy was struck. I also said in answer to the question, 'Could you tell whether or not the emergency brakes were applied?' 'I could not, only by the train slowing up.' I stated that the way I knew the emergency brakes were applied was by the train slowing up, and that statement was correct. There must have been a slow-up of that train. Barry was slowing up to come into Whitehall.''

D. F. Riggs testified: ''The train was running very fast in comparison to the usual running into the station. I would say it was very fast before and after it struck the boy. After the train struck the boy it stopped immediately afterward. It was right near the depot when it struck the boy, and it stopped at the depot, or just passed the depot; I think before it finally came to a standstill it just ran past the depot. It went the length of a train or a little more beyond the usual stopping place. I heard the train whistle; he whistled as he came to the depot, or nearing the depot. The stock whistle blew several times before the boy was struck; just before and about the time he was struck the whistle was blown. It must have been 300 or 400 feet, I would judge, from the train to the boy when the stock whistle was sounded.''

E. O. Snails testified: "I heard the stock whistle from the engine. The stock whistle was blown seventy-five or eighty feet from the boy when I first noticed it. He also rang the bell. The train stopped in front of the depot, at the usual stopping place. I could not say for sure whether there was any checking of the speed for the stopping place or not. I saw the boy when he first went on the track. I should judge that was about 300 feet from where he was killed. He was going west, petting the dog on the head; he was looking down toward the dog. He made no movement whatever indicating that he saw the train. When the stock whistle started sounding, I should judge the train was about seventy-five or eighty feet from the boy. When I first saw the boy he was on the outer edge of the ties on the north side of the track. He was on the ties until the pilot hit him. I could not hardly judge how long he had been there. As I said before, he traveled in that way about 300 feet. He was just walking along slow, playing with the dog. I heard the accident whistle and the stock whistle and the crossing whistle."

Thomas Barry, the engineer, called by the plaintiff, testified: "The first I saw of the boy I was about ten car-lengths from him, when he first approached the track; that would be about 400 feet away. That train could be stopped in 300 feet, going thirty miles an hour at that point." On cross-examination he said: "When I first saw the boy, he was in a place of safety, clear of the rails." (Redirect.) "Q. How far from the place where he was struck was the boy when you first saw him? A. I could not say exactly to that; that ain't clear to me now how far he had walked along the track before I struck him. He was not in a place of danger when I first saw the boy; he got closer to the track afterward." (Recross.) "I could not stop my engine after the time that I saw the boy step from his place of safety into his place of danger. The train could not be stopped; it was impossible." The plaintiff here rested his case and the defendants moved for a nonsuit, which motion was overruled. Whereupon Barry testified for the defendants as follows: "When I first saw the boy, he was outside of the rails, clear of the engine, I should judge, about three feet when I first saw him, when he

started to walk up the track. He changed his location. By the time I started the stock whistle he started toward the track; he leaned off toward the track. When he came in toward the track, I put the brake into the emergency and tried to stop. There was nothing else that I could have done to have stopped the train, nor anyone else. The boy did not heed my danger signal; he never looked up. When I discovered he did not heed my signal, I started the stock whistle and put the brakes in the emergency, and did all I could to stop. I did all I could to avoid striking the boy; my intentions were not to strike the boy at any time. My purpose in sounding the stock whistle was to draw the boy's attention, so that he would step out of the way when he stepped in danger. If he had taken one step, he would have been out of the way. When I sounded the stock whistle, the engine was going about twenty miles an hour. When I struck the boy, I was going between twelve and fourteen miles an hour probably; it is pretty hard to judge about speed at a time when I was trying to stop. When I first sounded the stock whistle, going at the rate of twenty miles an hour, I could have stopped probably in 250 feet. I see the boy when he came up to the main line. I did not see him come from behind the cars; I did not know where he came from. I could not say how long the boy walked along the track before he was struck. He could not have walked very far; I could not say as to the distance. He did not ride the pilot. He was not knocked very far by the engine; I would say three or four feet. He did not go forward at all; just went out from the rails and fell down. I don't think he was playing with the dog; he had his left hand on the dog's head. He was looking down on the ground; seemed to have his head down. I did not see an engine opposite the boy. I did not reverse my engine. Had I done so I would not get any braking power at all. I had my driving brake set. If I had put the engine in the back motion, I would have skidded the locomotive, and that would not hold it near so much as with the driving brake set; you cannot use both to advantage. I released the air-brake just after striking the boy, and went on to the depot. I could have stopped in fifty or sixty feet, if I had left the brakes set. The boy was not

close to the track when I first saw him.    He was not in reach of the pilot beam all the time.    I was about seventy-five or eighty feet, maybe a little more, from him when I began to blow my stock whistle.''

The witness was then asked concerning certain testimony given by him before the coroner, and he answered that he did not remember whether he so testified or not.    Finally, his entire testimony given at the coroner's inquest was received in evidence by consent.    We quote therefrom as follows: ''When I first saw the boy, it seems he came out from behind two box-cars which were setting on the east end of the house track, and moved over to main line.    I was about ten car-lengths away on the main line, coming to the station.    I saw the boy alongside the track, and I whistled the road crossing whistle.    At the same time the bell was ringing.    I could not arouse him, so then I whistled the stock signal up until I struck him.    When I saw I couldn't arouse him with the whistle, and he didn't turn around with me approaching, I put the brakes in the emergency notch and slowed down pretty slow.    The boy was outside both rails and ties and with back to the engine was walking toward the station.    The pilot beam extends beyond the ends of the ties.    The boy rolled quite a way after he was hit.    I do not think he heard the whistle; he would have looked up if he had.    I put the brakes in the emergency notch before I blew the stock whistle, seeing that I couldn't arouse him.    This was after I blew the road crossing whistle.    I put on the emergency brakes just as soon as I saw him coming to the track.    I supposed he was going to cross.    He didn't cross, but started up alongside the track.    Then I sounded the crossing whistle.    He was in reach of the pilot beam all the time after coming to the track.    He was quite a way east of the crossing when struck.    I don't suppose he saw the engine.''    On further cross-examination he testified: ''Q.    The statement is true as you gave it here, that if you had not released the brakes, the door of the baggage-car would have stopped right at the boy? A.    That would be a good deal of a guess, too.    I thought at that time I could have stopped the train.    Q.    It would have stopped right there?    A.    Maybe sooner than that.    Q.    How is it pos-

sible, if that train was going fifteen miles an hour at that time, and could have been stopped in fifty or sixty feet, and yet you say that it would require 250 feet to have stopped in going twenty miles an hour? A. In that case the other 250 feet is different from the time I hit the boy; that is a different proposition entirely. In making the stop like that with the train that morning, I had these brakes set to their full capacity, and I would stop sooner than if I was going to set the brake to make a stop from the release position. The brake was set when I hit the boy to the full capacity, and I would stop that train quicker than if I had to set the brake.''

It will be seen that the evidence is very meager as to what actually transpired. This is probably due to the fact that but a few seconds elapsed from the beginning to the end of the tragedy. Respondent's counsel contend that, because Barry was called as a witness by the plaintiff, the latter is bound by his testimony. We do not consider the matter important, and shall, moreover, treat all of the testimony as substantive in nature, notwithstanding that portions of it were given before the coroner. We do not attach much importance to Barry's statement that he did not intend to strike the boy. His acts speak for themselves so far as they are disclosed. We find no evidence that he intentionally ran his engine against the boy.

Was the death of Omer Haddox due to any willful act or omission on Barry's part? Our Penal Code (Rev. Codes, sec. 8099) declares that the word ''willfully,'' when applied to the **[1]** intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage. No different rule applies in civil cases. (*Palmer* v. *Chicago etc. R. Co.*, 112 Ind. 250, 14 N. E. 70.) The boy in this case was a trespasser and was guilty of negligence. (*Egan* v. *Montana C. Ry. Co.*, 24 Mont. 569, 63 Pac. 831; *Neary* v. *Northern Pac. Ry. Co.*, 37 Mont. 461, 97 Pac. 944, 19 L. R. A., n. s., 446.) Perhaps, by application of the doctrine of the last clear chance, a case of negligence could have been made out against the engineer. That doctrine

applies to negligence cases, and is not invoked. Therefore, the only question is as above stated. The learned district judge held that there was no substantial testimony to warrant the conclusion that Barry was guilty of willful conduct. This court, in *Neary* v. *Northern Pac. Ry. Co., supra,* quoting from Mr. Thompson's work on Negligence, said: ''It must be kept in mind that this obligation of care and effort [to stop] does not necessarily commence at the time when the men who are driving the train see the trespasser on the track, for he may be a mile away, and in no immediate danger. It arises at the moment when he is seen to be in a perilous situation.''

It is contended that Barry's testimony is contradicted and, contradictory, and might have been disregarded by the jury. And so it might have been, under certain circumstances. (*Bowen* v. *Webb,* 37 Mont. 479, 97 Pac. 839; *Poor* v. *Madison River P. Co.,* 38 Mont. 341, 99 Pac. 947; *Beeler* v. *Butte & London C. Dev. Co.,* 41 Mont. 465, 110 Pac. 528.) We shall therefore consider no part of it that is not corroborated. Juries may [2] not arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case. (*Mobile etc. R. R. Co.* v. *Jackson,* 92 Miss. 517, 46 South. 142; Rev. Codes, par. 1, sec. 8028.)

It is quite evident from all of the testimony that Barry saw the boy as early as did any other witness; that is, when he first approached the track. The engineer is careful to say that *at* [3] *that time* he was not in a place of peril, which of course is true, because he had not yet reached the danger point. It is also evident that at about the time the boy came close to the track, Barry sounded the crossing whistle. If Huddleston's testimony is given the effect most favorable to the plaintiff, the engine traveled 600 feet after the boy reached a place of danger. He says it was going thirty-five miles per hour, which would be fifty-one and one-third feet per second. Barry says he was about seventy-five feet from the boy when he began to sound his stock whistle, and in this statement he is corroborated by Snails. The intervening distance is 525 feet, which the engine

would cover in about ten seconds, if no lessening of speed took place. But Barry declares he applied the emergency brakes before he sounded the stock whistle, and Huddleston testified that the emergency brakes were applied and the train "slowed up." This corroborating testimony of the plaintiff's witness, Huddleston, is, we think, decisive of the case. We are left to conjecture as to what space of time elapsed after Barry discovered the boy and before he applied the brakes. It was necessarily but a few seconds, less than ten, and during that time he first sounded the crossing whistle. He had a right to determine for himself, provided he acted in good faith, when the boy reached a place of peril. A failure to exercise ordinary care in so doing would amount to negligence. (*Neary* v. *Northern Pac. Ry. Co.,* 41 Mont. 480, 110 Pac. 226.) The testimony shows, therefore, that within a space of less than ten seconds Barry was required either to act or to refrain from acting. When he first saw the boy it was his privilege to exercise an honest judgment as to what his course of conduct should be. He sounded the crossing whistle, observed that it was not heeded, applied the emergency brakes, and then continuously sounded the stock whistle. These facts are established by uncontradicted evidence. The district court was asked to determine from them, not that there was sufficient evidence of negligence to go to the jury, but that there was substantial evidence that Barry had a purpose and willingness to omit to take precautions to avoid striking the boy. We think the court properly ruled that the record failed to establish such a cause of action. Barry was in effect charged with the crime of involuntary manslaughter, an offense of which he is presumed to be innocent (Rev. Codes, sec. 7962), and in our judgment there was no substantial evidence upon which to base such a charge.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.