[No. 30492. Department Two. July 8, 1948.]

W. W. EWING, *Appellant*, v. PAUL F. FORD *et al.*,
*Respondents.*[1]

[1]Reported in 195 P. (2d) 650.

*Riddell, Riddell & Hemphill,* for appellant.

*Irving D. Smith,* for respondents.

STEINERT, J.—Plaintiff brought suit to recover an amount alleged to be due and owing to him by the defendants on an earnest-money receipt contract wherein defendants had agreed to purchase from the plaintiff a certain tract of real estate. Defendants answered, denying the material allegations of the complaint, and, by cross-complaint, sought rescission of the contract, because of alleged fraud on the part of the plaintiff, and recovery of all sums theretofore paid on the contract by the defendants. Plaintiff replied, denying the material allegations of the cross-complaint, and particularly those charging fraud.

The action was tried to the court without a jury. The court made findings of fact and conclusions of law, upon which it entered judgment declaring that neither the plaintiff nor the defendants should recover upon their respective pleadings, and that neither party should recover costs in the action. From that judgment, both parties appealed, but only the appeal of the plaintiff has been perfected or is now before us. For convenience, we shall refer to the plaintiff as appellant, and to the defendants as respondents.

No statement of facts or bill of exceptions has been brought to this court on appeal. In that situation, the only question presented for review is whether the findings of fact made by the trial court support the conclusions of law and the judgment based thereon. We have expressed that rule in a number of cases.

In *Levas v. Massachusetts Bonding & Ins. Co.,* 21 Wn. (2d) 562, 152 P. (2d) 320, which was a law action tried to the court, appears this statement:

"No statement of facts or bill of exceptions, however, has been brought to this court on appeal. In that situation, the only question presented for review is whether the factual findings of the trial court support the judgment; and in the consideration of that question it is to be conclusively presumed that such findings are correct. [Citing cases.]"

In the case of *In re Munson's Estate*, 189 Wash. 537, 66 P. (2d) 293, which was a probate proceeding, we stated:

"Inasmuch as the appellant has not served or filed a statement of facts or a bill of exceptions, the only question presented for review is whether the findings of the trial court support the decree."

In *Lager v. Berggren*, 191 Wash. 437, 71 P. (2d) 377, which was an action for specific performance of an alleged oral agreement to convey real estate, this court declared:

"Upon this appeal, there has not been certified any statement of facts or bill of exceptions. The case, of necessity, turns upon the facts found by the trial court. If these do not sustain the judgment, then a reversal must necessarily follow."

The facts of the case as found and stated by the trial court in its formal findings are as follows: Appellant, W. W. Ewing, is a real-estate broker doing business in King county, Washington. At all times involved in this action, respondents, Paul F. Ford and Evelyne W. Ford, were husband and wife. Mr. Ford is a veteran of World War II and as such was, and is, entitled to the privileges of the servicemen's readjustment act of 1944, sometimes referred to as the "G. I. Bill."

On or about September 14, 1945, during the period when houses for rent or sale were scarce, respondents, who never before had bought real estate, were exceedingly anxious to purchase and acquire a home for themselves.

At that time, Arthur Blakslee and L. Alva Blakslee, his wife, were the owners of a house and lot situated in King county and designated as the east 200 feet of lot 17, block "C," Beverly Park No. 3 Addition. That property was referred to throughout the trial, and will herein be referred to, as the "home property," to distinguish it from the property described in the next paragraph hereof.

At the same time, Blakslee and wife were also purchasing on contract from G. H. Rogers and Gretchen H. Rogers, husband and wife, an unimproved, vacant piece of property, approximately two hundred feet deep, situated directly in the rear of the "home property" and designated

as the westerly portion of lot 17, block "C," Beverly Park Addition, No. 3, less the easterly 200 feet of that lot. This vacant portion of lot 17, which was referred to throughout the trial as the "rear lot" and will be so referred to herein, was practically inaccessible except through the "home property," and was of far less value than the front, or improved, portion of the lot.

On or about September 14, 1945, respondents, through one of appellant's real-estate agents, entered into an earnest-money receipt contract, prepared by appellant or his agent, by the terms of which contract respondents agreed to purchase and the Blakslees agreed to sell the home property described above for the sum of $6,450. Although this earnest-money receipt contract made no mention of the fact that the purchase of the property was to be accomplished through a "G.I. loan," all parties concerned, at the time the contract was entered into, knew that respondents intended to finance the purchase through such a loan and that they were not otherwise able to acquire the property.

The earnest-money receipt contract also contained an agreement, between the Blakslees and appellant, under the terms of which the Blakslees were to pay appellant, as commission for the sale of the home property, the sum of $322.50 in cash, together with an assignment to appellant by the Blakslees of the latters' interest in their contract to purchase the rear lot from Rogers and wife.

At the time the earnest-money receipt contract was executed, respondents delivered to the real-estate agent their promissory note in the sum of five hundred dollars, to "bind the bargain," and on September 17, 1945, they made a payment of two hundred dollars on the note.

The home property was subsequently appraised for the purpose of a combination "F.H.A.-G.I." loan guaranty. By that appraisal, the property was valued at $6,300. In consequence of the appraisal in that amount, the appellant was notified by the proper Federal authorities that the government could not guarantee a loan to the respondents upon the home property, for the reason that the contract price of

the property, $6,450, was in excess of the reasonable value thereof, $6,300, as determined by the Federal appraiser.

Thereupon, on September 28, 1945, a conference between appellant and respondents was held in appellant's office, at which time appellant informed respondents that their application for an F.H.A.-G.I. loan had been disapproved because the property had been appraised at only sixty-three hundred dollars, which was one hundred fifty dollars less than the prospective sale price. Respondents were unable to raise sufficient cash to complete the purchase of the home property without such a loan. Appellant, presumably acting as the agent of the Blakslees, thereupon informed the respondents that under the terms of the earnest-money receipt contract of September 14, 1945, the earnest money would be liable to forfeiture, and that he would take steps to effect such disposition. With respect to appellant's good faith in making the foregoing statements and representations to respondents, we quote directly from the trial court's findings, as follows:

"That the statements and representations made by the plaintiff [appellant] to defendants [respondents] during said conference of September 28, 1945, were made without any evil or fraudulent intent on the part of plaintiff; that the plaintiff was sincere in his belief that the defendants earnest money under the agreement of September 14, 1945, was liable for forfeiture."

At the same time, according to the findings of the trial court, respondents believed and relied on appellant's statement that they would have no right to recover the earnest money if they did not go through with the contract, even without the F.H.A.-G.I. loan. Parenthetically, it may be stated that it does not appear from the findings whether or not the earnest money was, in fact or law, subject to forfeiture.

The conference of September 28, 1945, having developed the situation as above described, the appellant thereupon offered the respondents the following alternative: (1) that respondents enter into a new earnest-money receipt contract, under which they would purchase the home prop-

erty for sixty-three hundred dollars (the appraised value of that property), and at the same time enter into a separate contract under which they would purchase the rear lot for seven hundred fifty dollars; under this arrangement, if agreed to, the five-hundred-dollar promissory note previously given by respondents under the original earnest-money receipt contract was to be returned to them, and the two hundred dollars cash which had been paid on the note was to be applied on the new earnest-money receipt contract for the purchase of the home property; (2) if the respondents should not elect to purchase the two pieces of property on the terms above stated, appellant would take steps toward forfeiture of the earnest money paid on the original contract of September 14, 1945.

Confronted with this alternative, respondents agreed to enter, and did enter, into two new contracts as suggested by the appellant. The original contract of September 14, 1945, was canceled and the two hundred dollars theretofore paid thereon was applied as earnest money on "the new $6,300 contract for the purchase of the 'home property' via G.I. loan." This new $6,300 contract also contained a revised agreement between the sellers, the Blakslees, and the appellant, by the terms of which appellant was to receive for his commission on that sale only $175 in cash (instead of $322.50 as originally provided) plus the assignment of the Blakslees' interest in the rear lot.

The second new contract, constituting the contract for the sale and purchase of the rear lot for seven hundred fifty dollars, was executed by appellant as seller and respondents as purchasers. Respondents paid one hundred fifty dollars as earnest money on that contract. This second contract also required respondents to assume the obligation of the balance due on the Rogers contract, and to pay the remainder of the purchase price of the rear lot in cash. It was upon this second new contract that this action was subsequently brought.

On October 25, 1945, the new contract for the purchase of the home property was "closed." On that same date, appellant insisted that the transaction for the sale and pur-

chase of the rear lot likewise be closed, and respondents thereupon executed a promissory note in favor of appellant for the balance of cash due upon the purchase price of the rear lot. Shortly thereafter, respondents moved into the home property.

On or about November 1, 1945, respondents made a payment of twenty dollars to appellant, to be applied on the Rogers contract covering the rear lot; the application was made as required. Also on November 1, 1945, respondents made a payment of twenty dollars to appellant, to be applied on their promissory note held by appellant; a similar payment was made on December 1, 1945.

Thereafter, during the month of December, 1945, respondents notified appellant that they were repudiating the contract for the purchase of the rear lot and would make no further payments thereon. At the same time, they made demand for the return of the money which they had previously paid to appellant on that contract. Appellant rejected the demand.

On March 1, 1946, respondents sold the home property for the sum of seventy-eight hundred dollars, which was fifteen hundred dollars more than what they had paid for it.

In November, 1946, appellant instituted the present action to recover the amount alleged to be due and owing to him on the contract covering the rear lot and, at the same time, tendered into court a good and sufficient deed to the property.

Subsequent to the repudiation of the contract by the respondents, appellant made payments on the Rogers contract in order to keep appellant's equity in the rear lot in good standing; he also paid the taxes thereon as they fell due. The total amount owing by the respondents in the event that appellant should have prevailed in the action was $614.26 as of the time the findings were made and entered by the trial court.

Respondents cross-complained, seeking rescission of the contract covering the rear lot and asking for judgment for the total amount of moneys paid by them on that contract.

The trial court found that, if respondents should prevail, the amount which they would be entitled to recover was one hundred ninety dollars.

From these findings of fact, the trial court drew the following conclusions of law:

"(1) That the Servicemen's Readjustment Act of 1944, known as the G. I. Bill, provides in effect that loans thereunder are guaranteed only if made pursuant to certain provisions, one of which is that the price to be paid by the veteran shall not exceed the reasonable value thereof as determined by the appraiser. Payment of more than the reasonable value is contrary to public policy and constitutes constructive fraud even though without evil intent. There was a legal duty upon both plaintiff [appellant] and defendants [respondents] not to receive or pay more than the reasonable value as determined by the appraiser. Any plan wherein more than the reasonable value as determined by the appraiser is paid or agreed to be paid is against public policy and constructive fraud.

"(2) The plaintiff should not recover upon his complaint; the defendants should not recover upon their cross-complaint; neither party should recover costs.

"(3) That each party has excepted to the entry of these Findings of Fact and Conclusions of Law and said exceptions are hereby allowed and noted herein."

Judgment was rendered accordingly, and this appeal followed.

Seemingly, the trial court reached its conclusion and pronounced its judgment upon the theory that the transaction involving the two new contracts constituted a plan or scheme whereby the respondents were to purchase the home lot and pay therefor the sum of sixty-three hundred dollars, plus a bonus of seven hundred fifty dollars under the guise that this additional amount was for a separate, valuable piece of property, namely, the rear lot, when in reality the rear lot was of little or no value, and the seven hundred fifty dollars actually was a part of the purchase price of the home lot. Under this theory, the price actually paid for the home lot would amount to seven thousand fifty dollars, instead of sixty-three hundred dollars, the reasonable value of the property, thus, in the opinion of

the trial court, contravening the servicemen's readjustment act of 1944, 38 U.S.C.A. (Sup.), § 694a, and constituting constructive fraud and a violation of public policy.

If that was the theory of the trial court, we think it was erroneous for two reasons: (1) There was no finding by the court to the effect that the rear lot was of little or no value, but only that it was "far less valuable than the said home property"; for aught that appears in the findings, the rear lot may have had considerable value even though concededly less than that of the home property; and (2) the rear lot was not purchased with funds procured through the servicemen's readjustment act, and hence that act would have no bearing upon that transaction.

But whether or not the theory of the trial court was as suggested above, we are convinced that the court's findings do not support the conclusions or the judgment entered thereon.

■ This court has recently held that the servicemen's readjustment act has no relation to contracts pending or concluded between veterans and third persons. *Bryant v. Stablein*, 28 Wn. (2d) 739, 184 P. (2d) 45.

In that case, William R. Bryant, a veteran, and his wife entered into a written earnest-money receipt contract with Alvina V. Stablein, the owner of certain real property, whereby the Bryants agreed to purchase, and Mrs. Stablein agreed to sell, the property for fifty-eight hundred dollars. Pursuant to the application of the veteran for a "G.I. loan" guaranty, the property was appraised and a valuation of fifty-nine hundred dollars was placed upon it. Actually, the purchasers had paid the owner eight hundred dollars additional, as "side money," to consummate the deal. When the transaction was ready to be closed, the owner refused to complete it, claiming, *inter alia*, that a part of the funds paid to her by the purchasers was "illegal money." The purchasers thereupon brought suit for specific performance, and the owner defended upon several grounds, including the one above mentioned.

The servicemen's readjustment act, under which the purchasers had sought a loan guaranty, contained a provision which read:

"(3) That the price paid or to be paid by the veteran for such property or for the cost of construction, repairs, or alterations does not exceed the reasonable value thereof as determined by proper appraisal made by an appraiser designated by the Administrator." 38 U.S.C.A. (Sup.), p. 151, § 694a.

This quoted provision is the one upon which respondents and the trial court relied in the present action.

Upon that particular issue, this court said in the *Bryant* case:

"The second contention made by the appellants [owners] is that the contract of sale is illegal because of the payment of 'side money,' alleged to be in violation of the servicemen's readjustment act, from which quotation has been made above.

"Although the act provides, in effect, that loans thereunder are guaranteed only if made pursuant to certain provisions, one of which is that the price to be paid by the veteran for the property shall not exceed the reasonable value thereof as determined by the appraiser, there is no penalty fixed for paying or receiving more than the appraised value. In short, the act relates simply to the conditions under which the government *will guarantee a loan to the veteran* in the first instance, not to contracts pending or concluded between the veteran and third persons. If the price to be paid for the property is found to exceed its appraised value, the government may refuse to guarantee the loan. If it does authorize the loan and the funds are used for the purchase of property, the seller is not concerned with the source of the purchase price. He does not stand in the position of one who, having loaned money to the veteran, thereafter looks to the government for repayment thereof under its guaranty. His position is that of one who has been paid the full purchase price of his property as fixed by himself."

In the case at bar, respondents have paid no more for the "home property," which was the only property covered by their original contract, than its appraised value, namely, sixty-three hundred dollars. But even if they had in any manner agreed to pay, and had actually paid, more than its appraised value, that transaction of it-

self would not have been illegal. The government might indeed have refused to guarantee a loan for a greater amount than the appraised value of the property; but, as held in the *Bryant* case, *supra*, any payment by the veteran in excess of that amount would not make the transaction of sale and purchase illegal.

What we have said above constitutes the grounds upon which we base our decision. In addition, we may say, parenthetically, that the facts present no case of equity favoring the respondents.

They first contracted to purchase the home property alone for $6,450. When it was learned that the government would not guarantee a loan in that amount, a new plan was devised, under which respondents agreed to purchase the home property for $6,300, and the rear lot for $750.

The reduction in amount of the sale price of the home property did not come from the sellers' net price, but rather from the appellant's commission on that particular transaction. Although, by the second contract, respondents agreed to pay $750 for the rear lot, which adjoined the home property and was two hundred feet in depth, and although the rear lot may have been worth considerably less than the home property, the record does not establish that the rear lot was worth less than what respondents agreed to pay for it.

Respondents now seek to affirm and retain that portion of their agreement which is favorable to them and under which they have made a profit of fifteen hundred dollars within a few months, but seek to avoid that portion of their agreement which appears to them to be unfavorable. If they be held to their entire agreement, they will still have made a cash profit of seven hundred fifty dollars, plus whatever they may realize from the sale of the rear lot.

Upon the grounds stated above, and for all the reasons set forth herein, the judgment is reversed, with direction to the trial court to enter judgment for appellant in the sum of $614.25, as of October 10, 1947, plus a reasonable attorney's fee on the note of October 25, 1945.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.