This suit is on a promissory note of One Thousand ($1,000) Dollars, dated July 12, 1946, payable in monthly installments of $20 each, less nine payments made, executed by defendants, Franklin E. Willett and his wife to and in favor of the plaintiff. The note was given by the defendants to represent that much of the purchase price of a residence in the City of Shreveport, Louisiana, sold by the plaintiff to the makers. The balance of said price, $6,000, was paid from the proceeds of two mortgages on the property, given by the Willetts, and which were consummated and insured under the provisions of the Servicemen's Readjustment Act of Congress, of the year 1944, and amendments thereto, 38 U.S.C.A. § 693 et seq. Willett served in the military forces of the Government in World War No. II and was honorably discharged. *Page 339 
The suit is resisted on the ground that the execution and delivery of the note to and its acceptance by plaintiff were in contravention of the provisions of the acts of Congress referred to, and, therefore, for said reasons the note is null, void and unenforceable. Defendants reconvened and prayed for judgment against plaintiff for the amount of the payments made to him, or $180.
The lower court rejected both demands. Plaintiff appealed.
Answering the appeal, defendants pray for a reversal of the judgment insofar as the reconventional demand was rejected, and further pray for judgment in their favor as by them prayed in said reconventional demand.
In the month of February, 1946, the Willetts desired to acquire a home and became interested in plaintiff's. He was willing to sell for $7,000 cash but the Willetts had a very small amount thereof and this was badly needed for other purposes. They went to the office of S. H. Hetherwick, a loan broker in the City of Shreveport, Louisiana, and with his assistance applied for a combination FHA and GI loan of $7,000 on the property. He advised them to procure from plaintiff an agreement disclosing the price for which he was willing to sell the same. This was done, and on the following day defendants returned to Hetherwick's office with the sales agreement, wherein plaintiff declared that he would sell the property to the Willetts for $7,000 cash. The application with the sales agreement was promptly transmitted to the office of the Veterans' Administration in the City of New Orleans, Louisiana, for attention, and on March 2, 1946, advice was received from that office to the effect that a loan of $6,000 was the maximum that would be approved on the property and insured. The combination loan was then dropped. Thereafter, on or about April 10th, defendants again went to Hetherwick's office for the purpose of making application for a commitment on a straight GI loan against the property. They then informed Hetherwick that plaintiff had reduced the price of the property to $6,000. He then advised them that it would be necessary to procure another sales agreement from plaintiff evidencing his willingness to sell for $6,000, and very soon thereafter there was delivered to Hetherwick the desired agreement purportedly signed by the plaintiff. The new application, accompanied by this new agreement, was mailed to the New Orleans office of the Veterans' Administration, but action thereon was not had for some sixty days or more.
Plaintiff and his wife had grown weary from the long delay experienced in trying to close a trade with the Willetts, and informed Hetherwick that they intended to sell the property to another party unless the matter was promptly closed out. At that time, or soon thereafter, plaintiff and his wife, at the suggestion of Hetherwick, executed to him a warranty deed to the property for the price of $6,000 for which amount Hetherwick issued his personal check to plaintiff. The check and deed were delivered to Hetherwick's attorney with the request that he examine the title, and if found in satisfactory condition deliver the check to plaintiff. This was done.
The application for commitment on the loan of $6,000 was finally acted upon favorably. The loan was closed out on July 10, 1946, by execution by defendants of two mortgages on the property, following transfer thereof by Hetherwick to Franklin E. Willett for the expressed consideration of $6,000 cash. Thereafter, on July 12th, plaintiff and his wife went to the home of the Willetts (the property involved herein) for the purpose of having them execute the note sued on, in keeping with their prior agreement that this would be done as the final act in adjusting the purchase price of $7,000. Mrs. Willett filled in the blank spaces in the note, after which she and her husband signed same and it was delivered to the plaintiff.
The most seriously contested issue of fact in the case relates to the genuineness of plaintiff's signature to the second sales agreement. He and his wife deny positively that either signed it. They admit, however, that they knew the property had been appraised by a representative of the Veterans' Administration for $6,000. *Page 340 
Plaintiff's wife conducted nearly all of the negotiations covering a period of some four months and he admits that she was authorized to act for him and to affix his signature to all documents needful to the promotion and consummation of the sale of the property, and she testified that she advised him from time to time of developments and what she had done. It is contended by defendants that Mrs. Diamond signed her husband's name to the second sales agreement. It is certain that whoever signed the instrument did so to circumvent provisions and requirements of Federal laws. Without such agreement in the hands of the Veterans' Administration no commitment on the application would have been given, and the loan would not have been eligible for insurance.
According to the testimony of Mrs. Willett, she and Mrs. Diamond had a telephone conversation the morning of April 18th in regard to the pending sale of the Diamond home, and that Mrs. Diamond asked her if she would like to go with her to see Mr. Hetherwick about the matter, and Mrs. Willett assented. This was subsequent to the action of the Veterans' Administration in appraising the property at $6,000. Mrs. Willett further testified that she informed Mrs. Diamond in this telephone conversation that a new sales agreement was necessary to support the second application; that Mrs. Diamond drove to where she worked in the western part of Shreveport and there signed the new sales agreement, which had already been typed by Mrs. Willett. Mrs. Willett also testified that Mrs. Diamond understood the nature and meaning of the agreement because she had delivered to her (Mrs. Willett) one of the same character when the first application was made. She further testified that she and Mrs. Diamond then drove to Mr. Hetherwick's office and the agreement was delivered to him. Hetherwick testified that Mrs. Willett delivered the agreement to him, and that if Mrs. Diamond was with her at the time he did not see her. Mrs. Diamond testified that no such agreement was signed in connection with the first application. In this she is grievously in error as no application of this character would have been considered by the Veterans' Administration without positive written commitment by the owner that he would sell the property to the applicant and at a definite price.
Two bankers testified concerning the signature to the sales agreement. One was quite certain it was in the hand writing of Mrs. Diamond while the other was of the opposite opinion, but admitted that in some respects there is striking similarity in the formation of some of the letters thereof to identical letters in signatures written by her in open court. A close study and comparison by us of the signatures, in the light of other facts and circumstances of the case, has led to the conclusion that the sales agreement was signed by Mrs. Diamond as related by Mrs. Willett.
Mrs. Diamond had a serious interest in signing such an agreement. Unless she did so the whole proposition to sell to the Willetts would automatically collapse, and as testified to by her, since she did not think it was a violation of law to accept the note of the Willetts as part payment of the price of the property, by the same token she would not have thought it wrong to misrepresent the price at which she and her husband would sell. Her testimony on this score is materially affected by that given by her to the effect that she was advised that a second mortgage against the property to secure the note should not be taken, and her answer to the following question:
"Q. Did anybody else know anything about this side agreement of One Thousand ($1,000.00) Dollars, other than you and Mr. Diamond and Mr. and Mrs. Willett? A. No. We didn't tell anyone because they wouldn't have let us take the note."
We are informed in brief of appellees' counsel that the trial judge reached the same conclusion as we have with regard to the genuineness of the signature to the sales agreement.
The foregoing ruling carries with it, as a concomitant, that in order to induce favorable action by the Veterans' Administration on the second application, material facts were wilfully misrepresented. And, as a sequence, the owner and prospective *Page 341 
purchaser delayed execution and delivery of the note sued on until the successful consummation of the scheme that had as a predicate the partly false second sales agreement. Concerning transactions of this character, the court in Mazureau and Hannan v. W. H. Morgan, et al., 25 La. Ann. 281, said:
"The plaintiff's claim is inseparably connected with the unlawful contract, and must fall with it. (Davis v. Holbrook) 1 [La.] An. 176; (Armstrong v. Toler) 11 Wheat. (U.S.) 258 (6 L.Ed. 468)."
Concerning loans to ex-service men to enable them to acquire homes, Section 694a, Subchapter II, Title 38 U.S.C.A., in part reads:
"Any loan made to a veteran under this subchapter, the proceeds of which are to be used for purchasing residential property or constructing a dwelling to be occupied as his home or for the purpose of making repairs, alterations, or improvements in property owned by him and occupied as his home, is automatically guaranteed if made pursuant to the provisions of this subchapter, including the following:
"(1) That the proceeds of such loan will be used for payment of the property purchased or constructed or improved;
* * * * * *
"(3) That the price paid or to be paid by the veteran for such property or for the cost of construction, repairs, or alterations does not exceed the reasonable value thereof as determined by proper appraisal made by an appraiser designated by the Administrator. June 22, 1944, c. 268, Title III, § 501, 58 Stat. 292, as amended Dec. 28, 1945, c. 588, § 8, 59 Stat. 628."
The quoted language is unambiguous. The reasonable value of the property involved herein "was determined by proper appraisal made by an appraiser designated by the Administrator" representing the Veterans' Administration, and the guarantee of the loan, which the mortgages were given to secure was made upon false information as regards the amount of the price at which the property really was sold.
The acts of Congress herein referred to are designed to give relief to members of the armed forces, of limited means, who honorably served their country during World War II. It was realized by Congress that no greater duty rested upon it than to aid and encourage, in substantial ways, the establishment of homes by those who had loyally served the Government in its hour of peril. One of the several modes adopted to attain this desired end is reflected from the passage of laws that unequivocably insure against financial loss those persons who invest in notes of ex-service men, secured by mortgages on homes acquired by them. Before said insurance can become effective in any given case, inquiry is made concerning the ability of the ex-service man to repay the mortgage debt, and care is exercised to protect him against the assumption of obligations he might default upon eventually. For this reason, it is imperative that the correct sale price of a home be declared in the application for assistance. The wisdom of this policy is fully demonstrated in the present case. The defendants defaulted on the note in question ten months after it was signed, and this suit doubtless has caused some distress and disturbance in their financial affairs.
There does not appear to be any case in the jurisprudence of this state on all-fours with this one. The case of Federal Farm Loan Mortgage Corporation v. Hatten et al., 210 La. 249, 250,26 So.2d 735, is in some respects similar in principle. This decision declared abortive the effort of a creditor to circumvent the effect of his commitment to a Governmental agency to induce it to extend aid to the debtor then in financial distress.
General laws that strike down contracts which are immoral or against public policy or express law, have application to this case, such as Article 1892 of Civil Code, which reads as follows:
"That is considered as morally impossible, which is forbidden by law, or contrary to morals. All contracts having such an object are void."
In the scheme to consummate the mortgage loans involved herein, defendants had a part equal to that of plaintiff and his wife. The lower court left all concerned where *Page 342 
it found them, in that it denied recovery to both sides. We believe this to be an equitable solution of the entire controversy and, for the reasons herein given, the judgment appealed from is affirmed with costs.