HIGBY ET UX., APPELLANTS v. HOOPER ET AL., RESPONDENTS

No. 8944
Submitted April 14, 1950. Decided August 28, 1950.
221 Pac. (2d) 1043

Mr. Paul T. Keller, Helena, for appellant. Mr. Keller argued orally.

Mr. Floyd O. Small, Helena, for defendant, cross-complainant and respondent Hooper. Mr. Small argued orally.

Mr. David R. Smith, Helena, for cross-defendant and respondent, Home Building & Loan Ass'n. Mr. Smith argued orally.

MR. CHIEF JUSTICE ADAIR:

Don Higby served three years in the military forces of the United States during World War II.

In May 1945, Higby, then aged 28, was honorably discharged from the Army and returned to Helena, Montana, where he obtained employment in the office of an insurance company.

At the times here involved the nation was confronted with an acute housing shortage. Houses for rent or sale were scarce and materials for construction purposes were unobtainable except by persons to whom the law granted a preference and priority over other users.

Higby and his wife Lorraine were of limited means. Their savings amounted to but $500, yet both were exceedingly desirous of acquiring a small home to be occupied by themselves and children and they set about planning for the financing and construction of such a dwelling.

As an honorably discharged veteran of World War II, Higby was entitled to the loan benefits, priorities and privileges of the Servicemen's Readjustment Act of June 22, 1944, as amended, commonly known as the "G. I. Bill," 38 U. S. C. A. sec. 693 et seq.

In December 1945, the veteran and his wife discussed their finances and plans with Fred D. Hooper, a general building contractor of more than twenty-four years experience in the contracting business. The two had been well and personally acquainted for fifteen years or more. Hooper's son and the veteran had been boyhood friends and companions, having grown up, played, hunted and fished together, and the Higbys had implicit confidence in Hooper's integrity and ability as a builder.

From a rough sketch made by the veteran and his wife, Mr. Hooper drafted and submitted to the Higbys blueprint plans and written specifications for the construction of the proposed dwelling. The Higbys approved the plans and specifications and in January 1946, entered into a verbal agreement with Mr.

Hooper for the construction of the dwelling to be built in accordance therewith.

To finance the proposed construction the Higbys were to supplement the $500 which they then had in the bank with an additional sum of $2,000 which they had arranged to borrow from Mrs. Higby's father and the balance was to be raised through a ''G. I. loan'' which would enable them to obtain the advantages of a long-time amortized loan at a low interest rate (4%) and also the preference, priorities on construction. materials and other privileges available to an honorably discharged veteran under the ''G. I. Bill of Rights,'' supra.

The veteran first applied to the Union Bank and Trust Company of Helena, for a G. I. loan but his application was turned down. Thereupon the veteran was directed by Mr. Hooper to apply to the Home Building and Loan Association of Helena of which Mr. Hooper is a stockholder, and this the veteran did, such association being an authorized lending agency incorporated under the laws of the state of Montana and subject to examination and supervision by the state.

The proposed dwelling was to be constructed on lots numbered 11 and 12 in block 4 of the Lockey addition to the city of Helena, to which lots the Higbys had acquired title in fee simple.

The builder declined to commence construction until the money to be borrowed from Mrs. Higby's father was made available.

April 8, 1946, the Higby's received the $2,000 from the above source.

April 19, 1946, the plans and specifications and the lots on which the dwelling was to be constructed were inspected by an appraiser designated by the Veterans' Administration and appraisal report (VA form 4-1803) filed with the Veterans' Administration at Fort Harrison, Montana, appraising the lots at $400 and the dwelling and improvements to be constructed thereon at $9,100. Paragraph 17 of the appraisal report reads:

"17. Comments: See copy of specifications attached for detail of materials and general construction features."

April 24, 1946, the builder commenced excavating on the lots for the foundation and basement being the first work done under the contract. The excavation was completed within a few days and immediately following the Home Building and Loan Association, with whom the application for a G. I. loan was then pending and undetermined, through its managing officer John W. Schroeder, advised both the borrowers Higby and the builder Hooper that it would be impossible to make the loan without a letter or statement in writing from Hooper embodying the oral agreement between the parties for the construction of the dwelling.

Mr. Higby testified that Mr. Schroeder informed him that he "should have a reiteration of that contract, of that oral agreement."

On May 13, 1946, in compliance with the request of both the lender and the borrowers for a writing setting forth the contract, Mr. Hooper, the builder, signed and delivered to the Home Building and Loan Company a letter prepared for him by Attorney David R. Smith, reading:
"Paul W. Smith
  David R. Smith
  J. Miller Smith
  Attorneys At Law
      Suite 5
  Penwell Block

                                    Helena, Montana
                                    May 13, 1946
"Mr. Donald Higbe
  Helena, Montana
"Dear Mr. Higbe:
  "Whereas I am about to build a house for you on lots owned by you in the City of Helena, Montana, in accordance with the plans and specifications submitted to me therefor, and agreed upon, I am hereby certifying in writing that the complete cost

of the same in accordance with said plans and specifications will not exceed the sum of $8,300.00.

"Very respectfully yours,

/s/ Fred D. Hooper

"DRS:aw"

Neither of the Higbys was present when the above letter was written or signed nor was either present when it was delivered to the building and loan association.

May 18, 1946, the Higbys paid the builder Hooper $1,000 on the contract out of the money they had received from Mrs. Higby's father and on July 6, 1946, they paid the builder the further sum of $1,000, thereby exhausting the money that had been borrowed from the wife's father.

The Home Building and Loan Association made an amortized twenty-year, 4% loan in the principal sum of $5,800 to the Higbys secured by a real estate mortgage on the aforementioned city lots and improvements including the dwelling to be constructed thereon and reported such loan to the Veterans' Administration at Fort Harrison, Montana, with application for a government guaranty thereon, the report being accompanied by (1) the original of Don Higby's honorable discharge from military service; (2) the original letter of May 13, 1946, from Fred D. Hooper, the building contractor, to Higby and (3) the appraisal report (VA Form 4—1803) dated April 19, 1946, made by the designated appraiser.

July 11, 1946, the mortgage to the Home Building and Loan Company was recorded in the office of the county clerk and recorder of Lewis and Clark county, Montana, and in August 1946, the Higbys commenced making the monthly installment payments called for by such mortgage.

The construction work moved very slowly. As the work progressed the Home Building and Loan Company disbursed and paid direct to the builder Hooper out of the loan and on the contract, various sums amounting in the aggregate to $5,000.00. In addition the Higbys with the consent and approval of the builder had expended further sums totaling $221.18 for scarce

materials requiring priorities which they purchased and for which they were entitled to credit by the builder.

Winter came with the dwelling still unfinished. The Higbys were threatened with eviction from the house in which they were living and they found it increasingly difficult to make the monthly installment payments on their loan and also to pay rent, so on January 3, 1947, they moved into the unfinished home.

Five days later Mr. Hooper informed the Higbys that the construction costs of the dwelling "had run over about $2000" and asked them to make application to the Home Building and Loan Company to increase their loan by such amount. This the Higbys declined to do, advising the builder that they were standing on their contract which they had entered into in good faith.

Mr. Hooper, the general building contractor, failed to pay three subcontractors employed by him who had furnished work and materials on the house and on or about February 27, 1947, mechanic's liens were filed against the property as follows: Carl W. Carlson for plumbing materials and labor furnished between June 20, 1946, and February 21, 1947, $1,312.72; Carl Peterson for cement and cement finishing labor furnished between December 6 and 9, 1946, $236.90; S. A. Douglas for plastering material and work furnished between November 14, 1946, and February 22, 1947, $361.60, such three liens totaling $1,911.22.

Also on February 27, 1947, the builder Fred D. Hooper filed a mechanic's lien sworn to before David R. Smith, as notary, claiming an unpaid balance owing Hooper for materials and labor furnished by him on the house between April 24, 1946, and February 6, 1947, in the further sum of $1,489.44.

The total claimed in the four mechanic's liens is $3,400.66. Exclusive of interest, costs and attorney's fees, such amount, added to the $7,221.18 already paid to Hooper would run the cost of the unpainted and unfinished dwelling to $10,621.84,

being $2,321.84 in excess of the maximum cost certified by Hooper in his letter to Higby of May 13, 1946.

The mechanic's liens became and were superior to the prior mortgage given the Home Building and Loan Association. R. C. M. 1947, section 45-506, provides: "The liens attach to the buildings, structures, or improvements for which they were furnished or the work was done in preference to any prior lien, encumbrance, or mortgage upon the land upon which said buildings, structures, or improvements are erected; and any person enforcing such lien may sell the same under execution, and the purchaser may remove the property sold within a reasonable time thereafter."

In order to protect their property against the mechanic's liens filed by the subcontractors Carlson, Peterson and Douglas, the Higbys were compelled to borrow from a friend, Dr. Gordon L. Doering, the further sum of $1,911.22, with which they paid the amounts then due on the respective claims and liens of the named subcontractors.

The written specifications prepared by the builder and agreed upon by the parties provide for the painting of the dwelling both inside and outside, reading:

"Painting

Exterior, 3 coats
Interior trim and cabinets, 3 coats gloss finish
Wall, 1 coat, casein or cold water paint, except
Bath and Kitchen, 3 coats gloss finish."

Mr. Hooper wholly failed to comply with any of the quoted specifications governing the painting of the dwelling, the only painting which the house received being such as was done by the Higbys in the spring of 1948. Plaintiffs allege the cost of painting the house to be $607.40. Mr. Hooper's estimate on the painting job at the beginning was $700.00.

After they had paid the claims and liens of the subcontractors Carlson, Peterson and Douglas, the Higbys, as plaintiffs commenced the instant action against the defendant Fred D. Hooper.

The complaint sets forth two causes of action. A copy of the plans and specifications marked Exhibit A and a copy of the letter of May 13, 1946, marked Exhibit B, are attached to and made a part of the complaint. In their suit plaintiffs seek to expunge from the county records, as illegal and invalid, the mechanic's lien filed against their property by the defendant Hooper and recover damages for defendant's failure to complete and finish the dwelling according to contract and in a workmanlike manner.

In his answer the defendant Hooper: Admits that he offered to build a house for plaintiffs pursuant to the plans and specifications so prepared by him and submitted to plaintiffs; admits that plaintiffs approved such plans and specifications and that defendant thereafter entered upon plaintiffs' lots and commenced the construction of the house according to such plans and specifications and that there was paid to defendant "and credited the sum of $7,221.18 upon the construction of said house;" admits that defendant furnished to plaintiffs the letter of May 13, 1946, and that Exhibit B of the complaint is a copy thereof; "admits that he did not do any painting upon said house; and admits that the painting of said house will cost at least the sum of $607.40;" admits that plaintiffs furnished to the defendant certain light fixtures in the sum of $33.00 and linoleum in the sum of $33.78 for which defendant was to give plaintiffs credit and that plaintiffs have been forced to pay the sum of $20.37 for heating said house while it was under construction "and alleges that plaintiffs were given full credit for said items and all thereof; and that same have been credited and deducted from the balance claimed by defendant to be owing to him for the construction of said house."

Hooper's answer also: Denies that he contracted to build the house for the sum of $8,300 or for any other specified amount; "denies that there was ever any specified, limited or contract price for the construction of said house; and denies that the painting of said house, or any other part of the construction thereof, was required to be done for any specified price; but

alleges that it was understood and agreed that said house should be constructed, by defendant for plaintiffs, on a basis of cost of materials and labor, plus 10% to defendant for his services as a contractor;'' denies that his letter of May 13, 1946, ''was given, understood or intended, either by defendants or plaintiffs as any kind of a contract * * * or for the purpose of reaffirming any previous oral agreement whatsoever;'' and alleges that he furnished the letter to plaintiffs at their request ''merely as an accommodation to plaintiffs'' to be used ''to facilitate a loan which they were then seeking * * * and * * * that the sum $8,300 therein mentioned, was merely an estimate as to what would be the cost of the construction of said house * * * and it was then and there specifically understood and agreed between plaintiffs and defendant that said writing * * * should not be considered as any binding agreement upon defendant for the construction of said house.''

The answer further avers that the total cost of the house was $8,711.26, plus $1,911.22, the amount of the liens of the subcontractors, and that the sum of $1,489.44 is due the defendant Hooper as set forth in the lien which he filed; that further liens against the premises in the sum of $1,911.22 are owned and held by Dr. Gordon L. Doering and that plaintiffs had accepted the house as turned over to them by defendant without objections.

Answering plaintiffs' second cause of action seeking damages for breach of the contract, defendant in general denied the allegations thereof.

In a cross-complaint incorporated in his answer the defendant Hooper named as cross-defendants the plaintiffs, the Home Building and Loan Association and Dr. Gordon L. Doering and therein sought foreclosure of his lien against plaintiffs' property in the sum of $1,489.44 and for attorney's fees and costs.

Plaintiffs filed a reply placing in issue the new matter and affirmative allegations of defendant's answer and cross-complaint and the Home Building and Loan Association filed an

answer alleging its mortgage to be a lien prior and superior to the mechanic's lien of the defendant Hooper.

The action, treated by all the parties as a suit in equity, was tried to the court sitting without a jury. Findings of fact, conclusions of law and decree were made and entered against plaintiffs and in favor of the defendant and cross-complainant Hooper for $1,489.44 and attorney's fees and costs.

From the decree so entered against them, plaintiffs have appealed.

Plaintiffs assign as error the making of certain of the trial court's findings of fact; the admission of parol evidence to vary the terms of a contract in writing and the adjudications and awards made in the decree.

R. C. M. 1947, section 93-216, provides: "* * * In equity cases, and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered * * *." See Hart v. Barron, 122 Mont. 350, 204 Pac. (2d) 797, 802; Miller v. Miller, 121 Mont. 55, 190 Pac. (2d) 72; State ex rel. Nagle v. Naughton et al., 103 Mont. 306, 310, 311, 63 Pac. (2d) 123, and cases therein cited.

Pursuant to the mandate of the foregoing statute and that of our Bill of Rights, sec. 6, Art III, Const., we shall proceed to review and determine the questions of law and fact presented in the record before us.

The Servicemen's Readjustment Act, under which the veteran sought a "G. I. loan" to enable him to acquire a home, provides in part:

"(a) Any person who shall have served in the active military or naval service of the United States at any time on or after September 16, 1940, and prior to the termination of the present war and who shall have been discharged or released

therefrom under conditions other than dishonorable after active service of ninety days or more * * * shall be eligible for the benefits of this subchapter. Any loan made by such veteran within ten years after the termination of the war for any of the purposes, and in compliance with the provisions, specified in this subchapter, is automatically guaranteed by the Government by this title in an amount not exceeding fifty per centum of the loan: *Provided,* That the aggregate amount guaranteed shall not exceed * * * $4,000 in the case of real estate loans; * * *

"(b) Loans guaranteed under this subchapter shall be payable under such terms and conditions as may be agreed upon by the parties thereto, subject to the conditions and limitations of this subchapter and the regulations issued pursuant to section 694d of this title: *Provided,* That the liability under the guaranty within the limitations of this subchapter shall decrease or increase pro rata with any decrease or increase of the amount of the unpaid portion of the obligation: *Provided further,* That loans guaranteed under this subchapter shall bear interest at a rate not exceeding 4 per centum per annum and shall be payable in full in not more than twenty-five years * * * *And provided further,* That * * * (2) any loan for a term in excess of five years shall be amortized in accordance with established procedure; (3) except as provided in section 694e of this title any real-estate loan, other than for repairs, alterations or improvements, shall be secured by a first lien on the realty * * *

"(c) An honorable discharge shall be deemed a certificate of eligibility to apply for a guaranteed loan * * * Upon making a loan as provided in this subchapter, the lender shall forthwith transmit to the Administrator a statement setting forth the full name and serial number of the veteran, amount and terms of the loan, and the legal description of the property, together with the appraisal report made by the designated appraiser. Where the loan is automatically guaranteed, the Administrator shall provide the lender with a loan guaranty cer-

tificate or other evidence of the guaranty. He shall also endorse on the veteran's discharge, or eligibility certificate, the amount and type of guaranty used, and the amount, if any, remaining. An amount equivalent to 4 per centum on the amount originally guaranteed shall be paid to the lender by the Administrator out of available appropriations, to be credited upon the loan. Nothing in this subchapter shall be deemed to preclude the assignment of any guaranteed loan nor the assignment of the security therefor.

"(d) Loans guaranteed under this subchapter may be made by any Federal land bank, national bank, State bank, private bank, building and loan association, insurance company, credit union, or mortgage and loan company, that is subject to examination and supervision by an agency of the United States or of any State or Territory, including the District of Columbia. * * *" 38 U. S. C. A. sec. 694.

"Any loan made to a veteran under this subchapter, the proceeds of which are to be used for * * * constructing a dwelling to be occupied as his home * * * is automatically guaranteed if made pursuant to the provisions of this subchapter, including the following:

"(1) That the proceeds of such loan will be used for payment of the property * * * constructed * * *

"(2) That the contemplated terms of payment required in any mortgage to be given in part payment of the purchase price or the construction cost bear a proper relation to the veteran's present and anticipated income and expenses; and that the nature and condition of the property is such as to be suitable for dwelling purposes; and

"(3) That *the price paid or to be paid* by the veteran * * * *for the cost of construction* * * * *does not exceed the reasonable value thereof as determined by proper appraisal made* by an appraiser designated by the Administrator." 38 U. S. C. A. sec. 694a, emphasis supplied.

"In order to enable persons who have served ninety days or more in the land or naval forces during the present war, and

who have satisfactorily completed their period of active military or naval service, to obtain materials required for the construction * * * of dwelling houses to be occupied by them, any department or agency of the Government, in allocating or granting priorities with respect to any materials, shall give to such persons a preference over all other users of such materials (except to the extent such materials are needed by such other users to meet actual military needs), without requiring any showing of hardship or other necessity for the construction * * * of such dwelling houses.'' 38 U. S. C. A. sec. 694f.

''The Administrator is authorized to promulgate such rules and regulations not inconsistent with this subchapter, as are necessary and appropriate for carrying out the provisions of this subchapter, and may delegate to subordinate employees authority to issue certificates, or other evidence, of guaranty of loans guaranteed under the provisions of this subchapter, and to exercise other administrative functions under this subchapter.'' 38 U. S. C. A. sec. 694d.

Among the rules and regulations promulgated by the Administrator under the authority of the foregoing statute is the following:

''Sec. 36.4305 Deviations; Changes of Identity. (a) A deviation of more than 5 % between the estimates upon which a certificate of approval has been issued and the report of final payment of the proceeds of the loan or a change in the identity of the property upon which the original appraisal was based will invalidate the certificate of approval unless such deviation or change be approved by the administrator; * * *.'' Veterans Administration, Lenders Handbook, 4—3.

In Diamond v. Willett, La. App. 1948, 37 So. (2d) 338, 341, the court, in considering the Servicemen's Readjustment Act, supra, said: ''The acts of Congress herein referred to are designed to give relief to members of the armed forces, of limited means, who honorably served their country during World War II. It was realized by Congress that no greater duty rested upon it than to aid and encourage, in substantial ways, the

establishment of homes by those who had loyally served the Government in its hour of peril. One of the several modes adopted to attain this desired end is reflected from the passage of laws that unequivocably insure against financial loss those persons who invest in notes of ex-service men, secured by mortgages on homes acquired by them. Before said insurance can become effective in any given case, inquiry is made concerning the ability of the ex-service man to repay the mortgage debt, and care is exercised to protect him against the assumption of obligations he might default upon eventually. For this reason, it is imperative that the correct sale price of a home be declared in the application for assistance. The wisdom of this policy is fully demonstrated in the present case.''

Of course ''the price paid or to be paid by the veteran * * * for the cost of construction'' is a vital factor to be considered and determined by the lending agency and also by the Veterans' Administration in the approval of any ''G. I. loan'' for one of the conditions imposed by the law is that such price does not exceed the reasonable value of the construction as determined by proper appraisal made by an appraiser designated by the Administrator. 38 U. S. C. A. sec. 694a, supra.

As before stated the reasonable value of the construction to be done in accordance with the written plans and specifications was appraised at $9,100 by the designated appraiser and should the price to be paid by the veteran exceed the sum determined by such appraiser, then, under the law, the loan would not be subject to automatic guarantee.

What then was ''the price * * * to be paid by the veteran * * * for the cost of construction'' in the instant case?

At the outset the agreement both upon the plans and specifications submitted by the builder and upon the price to be paid by the veteran for the cost of construction was verbal, there being no mention of price or cost in the written plans and specifications other than the specifications for the doors, which provide: ''Front to be selected, cost not to exceed $25.00'' imply-

ing that the builder was limiting the plaintiffs' selection to a front door costing not to exceed the maximum figure of twenty-five dollars.

The verbal agreement, subject to uncertainties, disputes, misunderstandings, difficulty of proof and other infirmities thereto attendant, sufficed so long as the builder and borrowers were operating on money borrowed from Mrs. Higby's father, but when such funds became exhausted and application for a "G. I. loan" was made to an incorporated, authorized lending agency subject to examination and supervision by the state and to the Veterans' Administration of the United States of America, the borrowers as well as the builder were at once confronted with exacting laws, rules, regulations and by-laws requiring certain and definite data and information concerning the commitments and agreement of the contracting parties and that is why the Home Building and Loan Association demanded and required, as a condition precedent to the making of a "G. I. loan" that the builder Hooper certify in writing his exact agreement with the veteran covering the kind and manner of construction and the price to be paid by the veteran therefor.

In compliance with such demand and requirement the builder Hooper subscribed his name to the writing addressed to the veteran, *inter alia,* stating: "I am hereby certifying in writing that the complete cost of the same in accordance with said plans and specifications will not exceed the sum of $8,300.00."

By so "certifying" the builder made certain and attested to the fact that he had contracted with the veteran to build and complete a house for him in accordance with the agreed plans and specifications for a price to the veteran which "will not exceed the sum of $8,300.00." Cf. Berry v. Richfield Oil Corp., 189 Or. 568, 1950, 220 Pac. (2d) 106, 113.

According to Black's Law Dictionary, p. 301, the word "certify" means: "To testify in writing; to make known or establish as a fact. Smith v. Smith, Ind. App., 110 N. E. 1013, 1014. To vouch for a thing in writing. State v. Abernathy, 190 N. C.

768, 130 S. E. 619, 620; State ex inf. Carnahan ex rel. Webb v. Jones, 266 Mo. 191, 181 S. W. 50, 52. To give a certificate, or to make a declaration about a writing. Ainsa v. Mercantile Trust Co. of San Francisco, 174 Cal. 504, 163 Pac. 898, 901.''

Webster's New International Dictionary, 2d Ed., defines the word ''certify'' as: ''1. To give certain information of; to make certain, as a fact; to attest authoritatively; to verify. 2. To testify to in writing; to make a declaration concerning, in writing, under hand, or hand and seal. 3. To give certain information to; assure; make certain.''

The builder delivered the writing to the lender to induce and enable the lender to make a ''G. I. loan'' of $5,800 to the veteran. The lender, in turn, delivered such writing to the Veterans' Administration to induce it to issue to the lender the government's guaranty against loss on the loan.

The veteran, the builder, the lender, as well as the government that was to act as insurer or guarantor of the loan, were and are entitled to stand on the contract as written. Compare Ettman v. Federal Life Ins. Co., D.' C., 48 F. Supp. 578, 580. Being in writing, the contract supersedes all oral agreements and stipulations of the parties. Helena Light & Ry. Co. v. Northern Pac. Ry Co., 57 Mont. 93, 102, 186 Pac. 702; Berry v. Richfield Oil Corp., supra.

The only evidence introduced at the trial on behalf of the defendant Hooper was the testimony of himself and the witnesses John W. Schroeder and Alger Johnson, the latter being a former employee of the Home Building and Loan Association. Johnson's testimony was confined exclusively to the condition of the dwelling in the year 1947 shortly after the Higby's moved therein. Johnson's testimony was that he inspected the house and found some heat grills missing, some split window casings and the plastering rough and neither straight nor true.

Over plaintiffs' objections the witness John W. Schroeder and the defendant Hooper were allowed to testify as to their understanding and construction of defendant's letter to Higby of May 13, 1946.

The witness Schroeder, on direct examination by defendant's counsel, testified that the writing was "for loan purposes and it was to be made with the understanding that that was all it was for." On further interrogation, he testified:

"Q. And will you state whether or not at the time he [Hooper] executed that, it was given as a contract to build for the price specified therein? A. That was not my understanding of it.

"Q. Will you state whether or not Mr. Hooper said anything as to whether that was his understanding? * * * A. You mean as to whether or not this was a contract.

"Q. Yes. A. It is my understanding that it wasn't; I have the impression that it wasn't. * * *

"Q. Now, from your participation and from your knowledge of the situation in that capacity, and in granting this loan, did you consider at that time that this was an absolute contract to build for the price stated there? * * * A. The answer to your original question would be 'no'."

On direct examination by his counsel the defendant Hooper testified as follows concerning the letter:

"Q. Well now, this says that you undertook to build the house for $8300.00. What have you to say as to whether or not at that time that was understood between you and Higby to constitute a contract to build for that sum? A. This did not constitute a contract. When John [Schroeder] presented me this for my signature, I objected and told John [Schroeder] this was only an estimate and that the painting was to be done by Higby; that was our arrangement, his agreement. I said it shouldn't be on this for the reason that if the painting would have to be done by me, it would be $700.00 more, in addition to this estimate, and I was informed that that had nothing to do with this, didn't pertain to any agreement between Higby and I, it was for loan purposes only.

"Q. Well now, previous to that time, as I understand, you and Mr. and Mrs. Higby had arrived at an oral understanding and agreement for the building of this house. Is that correct?

I mean previous to the time that you signed this letter. A. Yes, we had made our arrangements as to the way this was going to be built * * *.

"Q. Was there ever at any time any change in your original agreement that you have mentioned, that this job was to be done upon a cost-plus basis? A. That was the only agreement we had, that it was to be done on a cost-plus basis.

"Q. That was never changed. A. That was never changed.

"Q. And it wasn't intended by this writing to change it. A. Not at all, no. * * *

"Q. I think I am just about through. Oh, I don't know whether we mentioned it with you, we did with Mr. Schroeder. Anyhow, I will ask you again with regard to the painting. It was contended, you recall, by the testimony of Mr. and Mrs. Higby that you were talking about $500.00 for a painting job and that that would come off the $8300.00. A. That is their version of it.

"Q. What is your version of it? A. That the painting job is plus that $8300.00.

"Q. Were you talking about $500.00 or some other figure in that connection? A. No, I wasn't; our estimate on the painting job at the beginning was $700.00."

The above-quoted testimony was clearly inadmissible. It has no legal effect and it cannot be considered by the court, trial or appellate. Bauer v. Monroe, 117 Mont. 306, at pages 313, 314, 158 Pac. (2d) 485. See also Berry v. Richfield Oil Corp., supra.

R. C. M. 1947, sec. 13-907, provides: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise." This statute sets forth a rule of substantive law and not a rule of evidence. Bauer v. Monroe, supra.

Except for an exception not here applicable, the rule is as set forth in Restatement of the Law of Contracts, sec. 447, subsection (1), pp. 834, 835, namely that "a contractual duty or a duty to make compensation is merged in the duty created

by the formation of an informal written contract between the same parties providing for the same performance, if the written contract becomes by virtue of the parol evidence rule the only source for determining the parties' rights and duties * * *.

"*Illustration of Subsection* (1): 1. A and B enter into an oral contract by which A promises to paint B's house, and B promises to pay $800 therefor. Later the parties integrate the contract in an informal writing. A fails to paint the house as promised. B has no right of action on the oral contract, but only on the writing which the parol evidence rule makes the sole embodiment of it." See also: Restatement of the Law of Contracts, sec. 237; Berry v. Richfield Oil Corp., supra.

Under certain circumstances, none of which is here present, ▮ a person may show that the document in question was intended to serve the purpose of a mere jest, joke or sham. "But a just policy would seem to concede this only when the pretense is a morally justifiable one (as, to calm a lunatic or to console a dying person). When it is *morally beyond sanction*, or aims at an *evasion of the law* or a deception of other persons, by intention of the parties, that intention will not be given effect." 9 Wigmore on Evidence, 3d Ed., sec. 2406, subd. (1), pp. 16, 17.

The law does not allow parties to a contract to show that it ▮ was got up as a sham to deceive and defraud. Graham v. Savage, 110 Minn. 510, 126 N. W. 394, 396, 136 Am. St. Rep. 527, 19 Ann. Cas. 1022. So here the defendant will not be permitted to defeat his own solemn written contract by saying that it was given solely for a fraudulent and deceitful use. "He is estopped thus brazenly to assert his own covinous purpose." Hunter v. Byron, 92 Wash. 469, 159 Pac. 703, 704. See R. C. M. 1947, sec. 13-801. Cf. Federal Farm Mortgage Corp. v. Hatten, 210 La. 249, 26 So. (2d) 735; Ewing v. Ford, 31 Wash. (2d) 126, 195 Pac. (2d) 650; Fereria v. Nunn, Cal. App. 1950, 220 Pac. (2d) 20; Young v. Neill, Or. 1950, 220 Pac. (2d) 89, 94.

The doctrine of estoppel "precludes one who has made positive statements of fact to another, in reliance upon which the latter has acted, from denying their truth in any controversy between these two parties. * * * An estoppel, like a conclusive presumption, is a rule of substantive law masquerading as a rule of evidence." 5 Williston on Contracts, sec. 1508, pp. 4205, 4206.

To make the writing to which the builder affixed his signature on May 13, 1946, a binding contract under the facts and circumstances here shown, it was not necessary that the veteran also sign the document. Girard Life Ins., Annuity & T. Co. v. Cooper, 162 U. S. 529, 16 S. Ct. 879, 40 L. Ed. 1062; Hunter v. Byron, supra; 9 Am. Jur., Building and Construction Contracts, sec. 3, pp. 6, 7, n. 17.

According to the weight of authority, the mere occupancy and use by plaintiffs of their unfinished dwelling do not constitute an acceptance of the work as complying with the contract, or amount to a waiver of defects therein. 9 Am. Jur., Building and Construction Contracts, sec. 53, p. 40, n. 7. "An owner has a right to occupy his house at any time he chooses, and it takes more than mere occupation to constitute an acceptance of work not done by the contract or in accordance with the contract." Walter v. Huggins, 164 Mo. App. 69, 148 S. W. 148, 152. Compare Stillwell & Bierce Mfg. Co. v. Phelps, 130 U. S. 520, 9 S. Ct. 601, 32 L. Ed. 1035; Barton v. Morin, 281 Mass. 98, 183 N. E. 170.

Where as here the contract states no specific price but does set a definite sum as the maximum cost, the building contractor is not entitled to recover from the veteran an amount in excess of such maximum. 17 C. J. S., Contracts, sec. 367, pp. 826, 827, notes 77 and 96. See also, p. 825, notes 70, 71 and 74.

In Kennedy v. McKone, 10 App. Div. 88, 41 N. Y. S. 782, a building contractor entered into a contract for the making of certain alterations and improvements upon defendant's house. The contract was indefinite as to price other than to provide

that it should not exceed $1,500, and the court permitted the recovery of the reasonable value of the work done and materials furnished, but restricted such recovery *within the limit of the maximum sum* ($1,500) so named.

Plaintiffs' witness S. L. Berg, an architect and chief underwriter for the Federal Housing Administration, Helena, testified that he inspected the dwelling in April 1948, and detailed the numerous patent defects found by him evidencing inferior workmanship and the parties stipulated that the cost of correcting such defects would be about $150.00.

After a careful examination of all the testimony, exhibits ▆▆▆ and authorities we are of the opinion that the evidence strongly preponderates against the trial court's findings, conclusions and judgment. The rule that the trial court may not disregard uncontroverted credible evidence is fundamental. State ex rel. Nagle v. Naughton, supra, 103 Mont. page 310, 63 Pac. (2d) 123; Haddox v. Northern Pac. Ry. Co., 43 Mont. 8, 113 Pac. 1119.

The law and the evidence considered, plaintiffs are entitled to have rendered a judgment decreeing that the defendant and cross-complainant Fred D. Hooper take nothing by his answer or cross-complaint; adjudging null and void defendant's claimed lien against plaintiffs' property filed on or about February 27, 1947, being document No. 20661, and directing that it be cancelled and expunged from the records of Lewis and Clark county, Montana, and that plaintiffs have judgment against the defendant Fred D. Hooper for the sum of $1,348.37 with interest at the legal rate from May 9, 1949, and for plaintiffs' costs and disbursements.

The trial court's findings and conclusions are set aside; its judgment is reversed and the cause is remanded to the district court with directions to render judgment in accordance herewith. Remittitur to issue forthwith.

MR. JUSTICE FREEBOURN and THE HON. F. V. WATTS, District Judge, sitting in place of MR. JUSTICE METCALF,

disqualified, and THE HON. DAVID N. NYQUIST, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, disqualified, concur.

MR. JUSTICE ANGSTMAN:

I concur in the result and with what is said on the doctrine of estoppel but fail to see the applicability of section 13-907, R. C. M. 1947, or the case of Bauer v. Monroe, 117 Mont. 306, 158 Pac. (2d) 485.