LABELLA v. BAGGETT, et al.

Oct. 13, 1952

No. 38457          3 Adv. S. 16          60 So. 2d 576

102

*Stanney Sanders,* for appellant.

*Forrest G. Cooper* and *R. T. Love,* for appellees.

Roberds, P. J.

LaBella is a war veteran. He and his wife desired to acquire a home in Indianola, Mississippi. He was not able, or so he thought, to borrow money from private sources with which to purchase that home. He contacted the Veterans' Farm and Home Board of Mississippi (hereinafter called the Board), Chapter 500, Miss. Laws 1948. He was informed that agency did not lend money for the purpose of constructing houses; that it did do so to purchase houses already constructed. He was advised to acquire a lot, convey it to some builder under agreement for the builder to construct a house on the lot, in which event LaBella would be eligible for a loan in some amount. He did purchase a lot in Indianola, paying therefor $500.00. On January 27, 1949, he entered into the following contract with appellee, N. T. Baggett:

"In consideration of my having caused to be executed in favor of N. T. Baggett, of Indianola, Miss., by Mrs. Vera Vincent and husband a deed to the center one-third of Lots 2, 3 and 6 in Block 2, being a strip of land 55 feet from north to south and 150 feet from east to west in Block 2 of Boulevard Addition to the City of Indianola, Sunflower County, Mississippi, a duplicate map of which is of record in Book 1 at page 2½ of the Record of Town Additions on file in the office of the Chancery Clerk of said county, the said N. T. Baggett has agreed to build on said property with good materials and workmanship and to furnish all labor and materials for so doing, complete with lock and key job, a house and resident according to plans and specifications now agreed upon and fully understood, and to convey to the Miss. Veterans Farm & Home Board by special warranty deed for my benefit, to-wit, Buddie LaBella, within a reasonable time, and to build such house as will be approved by said Veterans Farm & Home Board, for not to exceed the sum of Four-Thousand Dollars, and when completed according to plans and specifications, to convey said property to said Board for my benefit, or to such other person, firm or corporation, as I shall designate.

"Witness my signature, this the 27th day of January, 1949.

(Signed)  Buddie LaBella

(Signed)  N. T. Baggett."

Pursuant to that arrangement LaBella, the next day, conveyed the lot to Baggett.  Baggett was the General Manager of appellee, Indianola Lumber Company.  On February 9, 1949, the following agreement was entered into between the Lumber Company and Mr. and Mrs. LaBella:

"February 9, 1949.

"Mr. and Mrs. Buddy LaBella,
Indianola, Miss.

"Dear Mr. & Mrs. LaBella:

"The Indianola Lumber Company agrees to construct a house 24′ x 32, using the Morris Williams House as a model. Room sizes, exterior, piers and finish work to be the same with these exceptions:

> Individual gas outlets in rooms instead of floor furnace.
>
> Check rail window in living room instead of polished glass.

"You are to furnish material and labor for painting interior of house. We are to fill the sheetrock and sand floors, but not finish floors.

"Sincerely yours,
Indianola Lumber Company,
N. T. Baggett, Mgr.

NTB :je
Accepted:
Buddy LaBella
Mrs. Buddy LaBella."

These two agreements embody the rights and obligations of the parties to this litigation.

LaBella filed this suit, alleging that Baggett had not complied with his contract, praying for (1) a decree so adjudicating and also adjudicating (2) that complainant owed Baggett only $3,100.00, the Board's appraised value of the house, and (3) ordering Baggett to execute to LaBella a deed to the house and lot upon payment to Baggett of $3,100.00; (4) for $1,000.00 damages resulting from breach of the agreement by Baggett and (5) for general relief.

Baggett, in his answer, denied he had breached the contract. He made his answer a cross bill and prayed for a decree (1) adjudging LaBella in debt to him in the sum

of $4,425.48, the value of the house he constructed, and for a lien on the premises to secure payment of that sum and, in failure of payment, for sale of the property and application of the proceeds to the debt.

Sometime after the bill was filed the Indianola Lumber Company, on petition of complainant, was made a party to the bill. The petition alleged that this Company had furnished materials and labor in the construction of the house and was claiming a lien on the property therefor.

The Lumber Company answered that it had furnished all labor and materials for such construction, and, by cross bill, prayed for a lien upon the property to secure payment of the debt and for an order of sale if the debt was not paid. It attached an itemized statement of all materials and labor it had furnished in the construction of.the house, aggregating the sum of $4,425.48.

The Chancellor dismissed the bill with prejudice; gave Baggett a personal decree against LaBella for $4,000.00 with legal interest thereon from September 1, 1949; fixed a lien upon the property to secure payment of that sum to Baggett and the Lumber Company; appointed the Clerk Commissioner and authorized and directed him to sell the property unless the debt and costs were paid within sixty days; ordered that the proceeds be used to pay the costs and Indianola Lumber Company $4,000.00, the balance, if any, to be paid LaBella, and assessed La-Bella with all costs, and that upon compliance with the decree that Baggett execute to LaBella a deed to the house and lot. From that decree LaBella appeals. There is no cross appeal. It is stated in the brief of learned counsel for appellant that since the rendition of the decree LaBella has complied therewith by paying the $4,000.00 and interest to the chancery clerk.

It is urged on this appeal that the court erred in requiring LaBella to pay more than $3,100.00 and in charging him with interest.

The deciding question is whether there was compliance by Baggett and the Lumber Company with the two quoted agreements. No opinion of the Chancellor appears in the record but his decree necessarily found there had been compliance with the agreements. If there is substantial evidence to sustain his conclusions it is our duty to affirm the decree.

It will be noted the agreement with Baggett obligated him to do four things: First, to construct upon the lot a house according to plans and specifications the parties had agreed upon; second, to use "good materials and workmanship"; third, to convey the house and lot to the Veterans Farm and Home Board, or to such other person as LaBella might designate, and, fourth, to build such house as that Board might approve.

The Lumber Company agreement supplemented the Baggett contract. That instrument gave the dimensions of the house to be constructed, "using the Morris Williams house as a model," with two differences, and imposing upon LaBella the obligation to "furnish material and labor for painting interior of house." In other words, the plans and specifications mentioned in the Baggett contract simply embodied the obligation to use the Williams house as a model with the exceptions above stated.

The Chancellor necessarily found the contractor had complied with the first two requirements of the contract above set out. The great preponderance of the testimony is to the effect he did do that—certainly we could not reverse him on that finding.

As to the third obligation of the contractor—that is, for Baggett to convey the house and lot to LaBella or someone named by him—Baggett offered to do that upon payment to him of the Four Thousand Dollars. That leaves for consideration the fourth obligation—that is, to build such house as would be approved by the Veteran's Farm and Home Board. We will now deal with that

question. We pass over and do not decide a question which might naturally here arise and that is whether that provision was binding and applicable only if a loan were made by the Board, and no loan having been made, that the provision is not effective. We dispose of it on the theory it is binding and effective.

(Hn 1) And, first, we should determine just what the provision includes. Appellant urges, and his entire case is based upon the assumption, that Baggett agreed to accept for the house the appraisal value which the Board might place thereon. We do not think he did that. The provision does not mention an appraisal value. And, in reason, it would have been rather foolish for Baggett to have agreed to accept as the entire value of the house the appraised value for a loan. Such loan value might have been a great deal less than the actual value. Under the law as it then stood the veteran had the right himself to pay as much as one thousand dollars more than the loan value of the property. Sec. 7, Ch. 500, Miss. Laws 1948. The clause means that the materials and workmanship should be satisfactory to the Veteran's Farm and Home Board for a loan. The amount of the loan was another matter. Of course, the contract limited the amount Baggett was to be paid to $4,000.00. The Chancellor did that.

Now, does the proof sustain the finding of the Chancellor, as he must have found, that the Board approved the materials and workmanship in this house as being suitable for a loan in some amount?

Mr. and Mrs. LaBella moved into the house in April or May, 1949, and were still occupying it when this lawsuit was tried. Mr. Henderson, an appraiser for the Board, inspected the property twice in 1949, recommending a loan of $3,800.00 provided certain defects, as he saw the situation, were corrected. Baggett and his witnesses testified that all defects were fully remedied. In the meantime the application had been retired to the files and again renewed at least twice. We do not detail all

of the communications and acts between LaBella, Baggett and the Board, occurring between May, 1949, and June, 1950, because we think events occurring after June, 1950, determine the question under consideration. Henderson made his final inspection in June, 1950, and reported his requirements had not been fully met. However, previously he had written the Board he thought it should drop the matter because "This is going to be a lawsuit between LaBella and Baggett and I think we better stay out of it and let them have it out. I have a letter from Mrs. LaBella saying that she don't want the house." While the negotiations were being had, during the time above mentioned, Mr. B. B. Allen, a prominent attorney of Indianola, and chairman of the Board, had been consulted by all parties, and after the final inspection by Henderson in June, 1950, the matter was placed in the hands of Mr. Allen. Mr. Henderson asked him to inspect the house and determine whether the requirements had been met. It appears Mr. Allen had already inspected the building before that time. After receiving this request from Mr. Henderson, and on July 13, 1950, he went to the house to inspect it. Mr. and Mrs. LaBella and Baggett were there. Mr. Allen made a careful inspection and examination of the house. He says all requirements had been fully met and that he informed the LaBellas the Board would make the loan provided they were satisfied; that regardless of the quality of materials and workmanship, the Board would not make a loan if the applicant was not satisfied. He said Mrs. LaBella then mentioned some defects but he told her they were unimportant and superficial. He told Mr. and Mrs. LaBella he was going to a meeting of the Board the next day in Jackson and the house was of such quality of materials and workmanship as that the loan would be made if they were satisfied, but that the Board would not make a loan to a dissatisfied borrower. Later that night Mr. Allen called counsel for the LaBellas and told him of the conversation which had taken place

between Mr. Allen and the LaBellas. That night a letter was given Mr. Allen, signed by the LaBellas, saying they would accept the house if the Board approved it, but also pointing out certain claimed defects they thought should be remedied. Mr. Allen evidently construed this letter as an expression of dissatisfaction on the part of the La-Bellas, and so reported to the Board. This is his undisputed testimony as to that situation: "I called and talked with him, (attorney for LaBellas) giving him a gist of our meeting down there. Then he came up and handed me that night sometime—while I was in town, he handed me a letter in which he pointed out certain objections that his clients had to the house, but said nevertheless, if we would make the loan and say the property was all right, he would go ahead—that was throwing the ax in my lap —and I threw it back in his, and told him we were not making the loan, unless they were satisfied—we had enough troubles with our Board to serve satisfied customers—so I went down and called it to the attention of the Board, and we passed it to the files."

Thus it is seen that there was ample testimony to justify the Chancellor in finding, if such finding was necessary to his decree, that the house had been constructed according to plans and specifications; that the materials and workmanship were of good quality for this type house, and that the Board was willing to approve it for a loan, and the reason the loan was not made was not because of defects in the building but because the Board concluded Mr. and Mrs. LaBella were not satisfied.

And in this connection, it is relevant to say that a number of witnesses testified that Mrs. LaBella was constantly finding fault with the house, and as one correction would be made, she would find something else wrong. At least, the Chancellor could have found that many of these objections were captious. Her next door neighbor testified that Mrs. LaBella told her they did not want the loan approved until they had finished paying for their

automobile. The fact they were living in the house and paying no rent also has some bearing on this question.

It will be noted the contract placed a maximum liability of $4,000.00 as the value of the house. The Chancellor held the LaBellas liable for that sum. Appellant contends that was not justified; that the Chancellor should have found the house was of less value than that sum. Two witnesses for the complainant put a money value on the house. Henderson, the appraiser, valued it at $3,100.00. Whether he meant that to be the value at the time and in its condition when he inspected it, or whether he intended that to be the value after his claimed defects were remedied is not certain. He testified as a witness that was his value assuming his requirements were met. However, in his appraisal report to the Board he used the expression "Depreciated value $3,110.40." Again his report stated, "I estimate the reasonable value 'as is' $3,800.00. When the repairs outlined above are made the reasonable value will be increased by at least the amount of the cost of such repairs." Mr. Henderson was an assistant appraiser. The chief appraiser was a Mr. Leo L. Brunson. He made a report to the Board, presumably based upon what he understood Mr. Henderson's appraisal to be. Mr. Brunson, in his report to the Board, certified the reasonable value to be $3,800.00, of which $700.00 was allocated to the value of the lot. His report then says "This reasonable value may be increased by the actual cost of completion of necessary repairs recommended for existing construction as itemized in Section 3." Both these reports, under the quoted provisions thereof, appear to mean that the appraisal of Henderson was in the condition he claims to have found the house when he appraised it, the value to be increased by the cost, or value, of the repairs and improvements made to meet the appraiser's requirements. The proof indicates that the cost of these repairs was several hundred dollars. Also, in weighing the testimony of Mr. Henderson, it is

noted that he placed a value on this house of $4.50 a square foot. A number of witnesses said such a house could not be constructed for $4.50 a square foot. In fact, Mr. Allen himself said that the cost of such a house would run to $5.50 to $6.00 a square foot, ''and on top of that, anything that had to be put in, in the way of outside connections''—such, we assume, as septic tank, etc.

The other witness for complainant who placed a money value on the house was a carpenter living at Greenville who did some work on the house. He valued it at $3,000.00. He modestly said that during the time he worked he considered himself the only skilled carpenter on the job.

Aside from Mr. Baggett himself, nine witnesses for defendants gave their estimates of the value of the house.

Mr. Frank C. Stebbins testified. He had been in the lumber business at Greenville for 25 years; he had built many houses; was at the time, or had been, appraiser for the Refinance Corporation; a building and loan association at Greenville, a number of life insurance companies and for the Veterans Administration. He examined this house the day he testified. He valued the house from $4,500.00 to $4,600.00.

Mr. M. G. Allen had been a contractor and in the lumber business in Greenville for 28 years. He also was an appraiser for the Veterans' Administration. He examined the house a few days before he testified. He placed a value on the house of $4,465.00.

Mr. Harvey Dickey had been in the lumber business at Moorhead, Miss., some 38 years. He had recently examined the house. He placed a value thereon from $4,300.00 to $4,500.00.

Mr. James D. Sulser had been in the contracting business for 13 years. He had examined this house. His value was from $4,200.00 to $5,000.00.

Mr. A. M. Allen had been in the contracting business for 35 years. He examined the house and valued it from $4,500.00 to $4,600.00.

Mr. A. M. Allen, Jr., had been in the building business for 20 years. He had inspected the house and valued it at $4,500.00.

. Mr. E. D. Ezell had been selling building materials for 26 years. He examined the house and valued it from $4,000.00 to $4,300.00.

Mr. L. L. Alford had been a building contractor for 23 years. He had inspected the house. He valued it at $4,500.00.

Mr. L. C. Vance was a farmer but had been in construction work for 28 years. He inspected the house three or four weeks before the trial. He valued it at from $5,000.00 to $5,500.00.

In addition to this, defendant Indianola Lumber Company introduced an itemized statement of the materials and labor, and values thereof, showing the actual cost of construction to be $4,425.48.

From this it is evident, at once, we think, the Chancellor was justified in finding the value of the house to be as much as $4,000.00. Indeed, we might justifiably assume, from this testimony, that the only reason he did not place a greater value thereon was because. he was limited to four thousand dollars by the contract.

Appellant invokes here the aid of the Federal Service Men's Adjustment Act. It is said by opposing counsel this contention was not made in the lower court. We are not quite clear what bearing or relevancy this argument has upon the issues as here made. The ultimate effect, we gather, as contended, is that Baggett practiced some kind of a fraud upon the State and Federal Veterans' lending agencies, in that he expected LaBella to pay $200.00 cash if the loan was made for only $3,800.00. He cites, among others, the cases of Young v. Hampton, (Cal.) 228 Pac. 2d 1, 19 A. L. R. 2d 830; Diamond v. Wil-

lett, (La.) 37 So. 2d 338; Higby v. Hooper, (Mont.) 221 Pac. 2d 1043, and Ewing v. Ford, (Wash.) 195 Pac. 2d 650. The cases are not applicable to the facts of the case at bar. In those cases loans were made. No loan was made here. In those cases side, secret agreements were entered into between the sellers and borrowers. Here no such agreement was made. The Veterans' Farm and Home Board knew of the agreement between LaBella and Baggett. LaBella had the right to pay, in addition to the loan, $1,000.00. Sec. 7, Ch. 500, Miss. Laws 1948. In those cases the court concluded fraud had been practiced on the lending agency. No fraud is shown in this case.

(Hn 2) The learned Chancellor charged LaBella legal interest from September 1, 1949. We think interest should have started July 13, 1950. That is the day Allen said the house was approved. We can find no other definite date at which interest should begin to run. The judgment here will include legal interest on the $4,000.00 from July 13, 1950. The decree of the lower court is affirmed with the above modification. Appellant is charged with the cost of the appeal.

Affirmed as modified.

*Alexander, Lee, Kyle* and *Ethridge, JJ.*, concur.